**Larry BOOKER, Petitioner-Appellant,**

**v.**

**John JABE, Warden, Kinross Correctional Facility, Respondent-Appellee.**

**No. 83–1136.**

United States Court of Appeals, Sixth Circuit.

Argued Sept. 20, 1984.

Decided Oct. 29, 1985.

1. The contention is vigorously disputed by Dayton-Hudson but no determinative finding on this question has been made.

Chari Grove, Detroit, Mich., for petitioner-appellant.

Frank J. Kelley, Atty. Gen. of Michigan, Eric J. Eggan, Edgar L. Church, Jr., Asst. Atty. Gen., Corrections Division, argued, Lansing, Mich., for respondent-appellee.

Before MERRITT and JONES, Circuit Judges, and BELL,* District Judge.

NATHANIEL R. JONES, Circuit Judge.

This appeal from denial of a petition for a writ of habeas corpus concerns the systematic use of peremptory challenges, in a single criminal prosecution, to excuse members of a jury venire from service on a state petit jury solely on the basis of their race. The decisive legal issues are whether the selection of the jury by the prosecutor and defense counsel violated either the Fourteenth Amendment's guarantee of equal protection or the Sixth Amendment's guarantee that criminal charges will be tried before an impartial jury. We conclude that *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), forecloses Booker's Fourteenth Amendment claim. We also conclude that a crimi-

nal petit jury that is the product of the systematic use of peremptory challenges, by either the prosecution or defense counsel, to excuse prospective jurors solely on the basis of their race is not an impartial jury within the meaning of the Sixth Amendment. Such abuse distorts the jury's decision-making, undermines the jury's integrity, and denies both the defendant and the public the impartial jury that the Constitution requires. Therefore, on the basis of the state trial court's findings that the prosecution and defense counsel systematically excused prospective jurors on the basis of race, we reverse the district court's denial of habeas relief and remand Booker's petition for issuance of the writ unless the State of Michigan promptly retries him.

**I.**

Larry Booker appeals from the district court's denial of his petition for a writ of habeas corpus, which he filed pursuant to 28 U.S.C. § 2254. Booker and his co-defendant are two black adult men who were accused of the armed robbery of a shoe store located in Lincoln Park, Michigan, outside Detroit. The robbers initially held two white, female clerks at gunpoint and then left them bound in the back of the store. At trial, in the Circuit Court of Wayne County, one clerk testified that Booker's co-defendant ripped off her clothes below the waist, touched her genitals, and offered a sexual act. The defendants presented alibis and claimed that they were mistakenly identified as the robbers. On May 1, 1975, a jury composed exclusively of white citizens convicted both defendants of armed robbery. At the same trial, Booker's co-defendant was charged with intent to commit rape and convicted of assault and battery. Booker was sentenced to a prison term of fifteen to twenty-five years.

After properly exhausting his appeals in the Michigan courts without receiving re-

* The Honorable Samuel H. Bell, United States District Judge for the Northern District of Ohio, sitting by designation.

dress, *see Rose v. Lundy*, 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982), Booker sought habeas relief in the District Court for the Western District of Michigan. The district court addressed the merits of Booker's claim that the jury selection process was so infected with racism that the resulting trial violated the Sixth and Fourteenth Amendments. The district court adopted the following findings and recommendations of the United States Magistrate and denied both Booker's Fourteenth Amendment claim and his Sixth Amendment claim.

It is an inescapable conclusion from a study of the arguments made by the parties that each side was excusing jurors primarily on the basis of their race. The spectacle of attorneys on both sides of a case dismissing jurors simply on the basis of their color is a deplorable one which tarnishes the image of our system of justice. Ultimately, it appears that such trial strategy is nevertheless permissible under some circumstances. Since I so read the Supreme Court's decision in *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), I respectfully recommend that habeas relief on this ground be denied for the reasons discussed below.

The magistrate accurately described the jury selection in this case. The white jury was the result of an open battle of peremptory challenges in which the prosecutor claimed he was responding to racist exclusions by the defense counsel, who in turn denied using peremptory challenges solely on the basis of race. The state trial court judge noted that the jury venire began with "substantially more white jurors than there were black." Tr. at 379. The record reveals that the prosecutor exercised twenty-six of his allotted thirty peremptory challenges. The prosecutor used his peremptory challenges to excuse twenty-two black potential jurors, in several instances without addressing any questions to the excused juror. The two defendants used all forty of their combined peremptory challenges and excused thirty-seven white prospective jurors.

When the resulting jury had been selected, the defendants moved for a mistrial in order to select another panel. During the discussion of this motion, defense counsel charged the prosecutor with excluding black jurors solely on the basis of race.

[T]he only time the Prosecutor indicated his satisfaction with the jury except for very early in the proceeding was when there were no black people on the jury.

I would suggest to the Court that this methodical exclusion of black people from the jury, even though albeit peremptory challenges, is prosecutorial misconduct at its most blatant.

Tr. at 374. The prosecutor did not deny this charge:

Early in the game, they could have passed the jury and had five or six black people, if they will remember, and quit being distorted about this.

They will remember, I said, I was satisfied with the jury as it now sits when we had five or six black people in that panel. I challenge them to say otherwise.

Tr. at 385.

Defense counsel expressly argued that the reasons the prosecutor methodically excused black prospective jurors, in a case involving two black male defendants and two white female victims, was exclusively because of those prospective jurors' race:

And then, the blacks that were down here were systematically excluded from the jury.

Now, we don't have to speculate. Mr. Easton [the prosecutor] has twice now called to the Court's attention that there were certain murmurs in the court. Perhaps, certain hissing kind of sound through lips from certain of the jurors. And we don't have to speculate on why. Because everyone in this courtroom was shocked by the systematic and unabashed way he went about excluding every black that sat on that jury.

. . . .

If there was any doubt, I heard Mr. Easton say to Mr. Ackerman, we can get

a conviction in this case if we don't get a black jury.

Now, I'll ask him to deny that. If he wants to deny it. I heard him say it.

And that furnishes, clears up any doubt in this matter as to what the specific intention here was.

The specific intention is to get a white jury to try two black men where there are two girls, two white girls who are the complaining witnesses.

Tr. at 375–76.

In his response, the prosecutor did not deny the statement attributed to him by defense counsel. He did not deny systematically excusing black prospective jurors solely on the basis of race. Instead, the prosecutor attempted to justify his practice.

I'm a friend of blacks, yellows, everything, but I have a duty, too.

And I have had four consecutive hung juries three years ago.

I'm a trial lawyer.

This is my hundred fifty-sixth jury trial in this building in the last four and a half years.

I have had hung juries because of the systematic eliminating of middle-aged white people.

I didn't start it. They started it.

. . . .

They polarized the jury to the point the ones that did come up here, I sit here and look at nine black people and I look at five white people.

How can, since they've done that, since they took off all the middle-aged white men and ladies in some cases, could I get a fair trial?

I think the victims have a right in this country too.

I'm not asking the jury to be partial. I don't think these ladies and gentlemen will be partial because of race. I'm not partial.

And I gladly would explain to Mr. White, the last black I took off, I would like to explain to him why I took him off.

I would say, Mr. White, I didn't want to put you in an embarrassing position.

I don't think Counsel realizes, I'm looking at the standpoint from this gentleman and the other gentlemen, finding himself in a room with maybe ten white people and maybe in their own conscience they might believe, I don't believe these two black men did it, and they may say to him you're saying that because you're black.

I could see it coming. I told Officer Ackerman, at the rate they're going, it's not too long that I'm going to have more challenges than they.

Tr. at 382, 384–85. Defense counsel closed by denying that they had ever attempted to empanel an all black jury.

After this remarkable exchange, the trial court noted that both the prosecutor and defense counsel had used their peremptory challenges for the purpose of excusing potential jurors because of their race. Tr. at 389. The trial court then denied the motion for a mistrial. The trial judge determined that no precedent authorized him to control the use of peremptory challenges by either the prosecutor or defense counsel.

## II.

*Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), forecloses Booker's claim that the prosecutor's use of peremptory challenges violated the Fourteenth Amendment. Swain was a black man who was convicted in an Alabama court, by a jury composed of white citizens, of the rape of a white woman. Swain was sentenced to death. On review by the Supreme Court, Swain alleged that the prosecutor's use of peremptory challenges to remove all six blacks from the jury venire constituted invidious discrimination that violated the Equal Protection Clause of the Fourteenth Amendment. The Court rejected this claim. After a thorough review of the long common law history of the peremptory challenge and its nature and function in the modern jury system, the Court declined to subject a prosecutor's use of peremptory challenges "in any particular

case to the demands and traditional standards of the Equal Protection Clause." *Id.* at 221, 85 S.Ct. at 836.

The Court arrived at this conclusion despite its finding that the peremptory challenge is a creature of statute rather than a constitutional requirement. *Id.* at 219, 85 S.Ct. at 835. As a tool by which to insure selection of a fair and impartial jury, the peremptory challenge is "one of the most important of the rights secured to the accused." *Id.* (quoting *Pointer v. United States,* 151 U.S. 396, 408, 14 S.Ct. 410, 414, 38 L.Ed. 208 (1894)). Peremptory challenges are available to the prosecution only to maintain an even-handed balance between the defendant and the state without which the availability of peremptory challenges to the accused might enable him to select a jury biased in his favor. *Id.* at 220, 85 S.Ct. at 835.

According to the Court's analysis in *Swain,* the proper function of the peremptory challenge is to promote the two preeminent characteristics of an impartial jury. By enabling the parties to eliminate the "extremes of partiality on both sides," *id.* at 219, 85 S.Ct. at 835, the peremptory challenge contributes to selection of a jury that both will make findings of fact on the basis of the evidence presented at trial and will "satisfy the appearance of justice." *Id.* (quoting *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955)). The peremptory challenge promotes these goals by supplementing the more stringently defined challenge for cause. Peremptory challenges enable the parties to strike a juror on the basis of a partiality that is merely suspected, not readily designated or demonstrated, or that counsel may have

created by vigorous voir dire inquiry in search of a reason to challenge for cause. *Id.* at 220–21, 85 S.Ct. at 835–36.

Because the purpose of the peremptory challenge is to enable parties to dismiss potential jurors for the most slender and evanescent of reasons, the Court found that its "essential nature" is its exercise "without a reason stated, without inquiry and without being subject to the court's control." *Id.* at 220, 85 S.Ct. at 836 (citations omitted). One consequence of this freedom is that under *Swain* jurors may be excused on the basis of "their group affiliations," including race, religion, and sex. *Id.* at 221, 85 S.Ct. at 836. Although the Court recognized that this holding flies in the face of traditional Fourteenth Amendment doctrine, it reasoned that the only alternative would be to subject the "prosecutor's judgment underlying each challenge ... to scrutiny for reasonableness and sincerity." *Id.* at 222, 85 S.Ct. at 837.[1]

Justice Marshall has observed that "*Swain* has been the subject of almost universal and often scathing criticism." *McCray v. New York,* 461 U.S. 961, 964, 103 S.Ct. 2438, 2440, 77 L.Ed.2d 1322 (1983) (Marshall, J., joined by Brennan, J., dissenting from denial of certiorari) (footnote omitted citing commentaries). *See also McCray v. Abrams,* 750 F.2d 1113, 1121 (2d Cir.1984) (citing commentaries). A majority of the Supreme Court has indicated its willingness at the proper time to consider "whether the Constitution prohibits the use of peremptory challenges to exclude members of a particular group from the jury." [2] *McCray v. New York,* 461 U.S. 961, 103 S.Ct. 2438, 77 L.Ed.2d 1322 (1983) (Stevens, J., joined by Justices Blackmun and Powell,

---

1. In *Swain* the Court did suggest, in dicta, that a prosecutor's use of peremptory challenges to excuse prospective jurors solely because of their race "in case after case" would violate the Fourteenth Amendment. *Swain,* 380 U.S. at 223, 85 S.Ct. at 837. Appellants appear to have met the burden of demonstrating such exclusion on only two occasions during the past twenty years. *See United States v. Childress,* 715 F.2d 1313, 1316 (8th Cir.1983) (en banc), *cert. denied,* —— U.S. ——, 104 S.Ct. 744, 79 L.Ed.2d 202 (1984).

2. Three state supreme courts have abandoned *Swain,* under the authority of their state constitutions. *See State v. Neil,* 457 So.2d 481 (Fla. 1984); *Commonwealth v. Soares,* 377 Mass. 461, 387 N.E.2d 499, *cert. denied,* 444 U.S. 881, 100 S.Ct. 170, 62 L.Ed.2d 110 (1979); *People v. Wheeler,* 22 Cal.3d 258, 148 Cal.Rptr. 890, 583 P.2d 748 (1978). An appellate court in New Mexico also has expressed its intention to follow this line of authority when the proper case arises. *See State v. Crespin,* 94 N.M. 486, 612 P.2d 716 (N.M.App.1980).

concurring in denial of certiorari; Justices Marshall and Brennan, dissenting from denial of certiorari). Moreover, the Supreme Court recently granted certiorari to review a decision in which the Kentucky Supreme Court relied on *Swain* to reject a defendant's challenge to a prosecutor's use of peremptory challenges in his individual trial. *See Batson v. Commonwealth of Kentucky,* 84–SC–733–MR (Ky., Dec. 20, 1984) (unpublished), *cert. granted,* —— U.S. ——, 105 S.Ct. 2111, 85 L.Ed.2d 476 (1985).

■ Were it within our power to right the manifest error that we believe *Swain* represents, we would hold that the prosecutor's conduct in the present case violated the Equal Protection Clause. We recognize both that our authority as an intermediate court is limited and that we cannot anticipate the outcome of *Batson.* Therefore, although we agree with the Second Circuit's cogent criticism of *Swain* in *McCray v. Abrams,* we also accept that *Swain* is "clear, direct, and unequivocal" in prohibiting an "equal protection challenge to the prosecution's racially discriminatory use of its peremptory challenges solely on the basis of the prosecution's acts in a single case." *McCray v. Abrams,* 750 F.2d at 1124. The prosecutor's use of peremptory challenges to select the jury in Booker's trial, although egregious conduct, did not violate the Equal Protection Clause as interpreted in *Swain.*

## III.

This holding, however, does not end our analysis. We do not join those Circuits that have interpreted *Swain* to immunize the use of peremptory challenges in each case from judicial scrutiny, regardless of the constitutional provision such inquiry seeks to enforce. *See United States v. Childress,* 715 F.2d 1313, 1320 (8th Cir. 1983) (en banc), *cert. denied,* 464 U.S. 1063, 104 S.Ct. 744, 79 L.Ed.2d 202 (1984); *United States v. Whitfield,* 715 F.2d 145, 147 (4th Cir.1983); *United States v. Jenkins,* 701 F.2d 850, 859–60 (10th Cir.1983); *United States v. Durham,* 587 F.2d 799, 801 (5th Cir.1979). The Supreme Court's dis-

cussion of peremptory challenges in *Swain* closed with a summary that it couched in very broad language. The Court's understanding of the purpose and function of the peremptory challenge led it to state that it could not hold "that the Constitution requires an examination of the prosecutor's reasons for the exercise of his challenges in any given case.... Any other result, we think, would establish a rule wholly at odds with the peremptory challenge system as we know it." *Swain,* 380 U.S. at 222, 85 S.Ct. at 837.

The Court, however, did not analyze the entire Constitution in *Swain.* Not until three years later did the Court extend the Sixth Amendment's guarantee of trial by an impartial jury to state criminal prosecutions. *See Duncan v. Louisiana,* 391 U.S. 145, 149, 88 S.Ct. 1444, 1447, 20 L.Ed.2d 491 (1968). Thus, in *Swain* the Court did not weigh the potential usefulness of the peremptory challenge against the danger that its misuse would obstruct the Sixth Amendment's express guarantee that each criminal jury must be impartial. We find persuasive the Second Circuit's recent reading of *Swain.*

> All of the Court's constitutional analysis focused on the Equal Protection Clause. We do not believe the single general reference was intended to remove this focus.

*McCray v. Abrams,* 750 F.2d at 1124. Therefore, *Swain* does not necessarily exempt peremptory challenges from review under the Sixth Amendment.

The Sixth Amendment provides, in relevant part, that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law...." The model impartial jury is composed of jurors who are disinterested individuals, capable and willing to determine the facts based upon the evidence presented at trial. *See Irvin v. Dowd,* 366 U.S. 717, 722–23, 81 S.Ct. 1639, 1642–43, 6 L.Ed.2d 751 (1961). A second essential fea-

ture of an impartial jury is its character as a democratic institution representing the community from which it is drawn. *Taylor v. Louisiana,* 419 U.S. 522, 526–30, 95 S.Ct. 692, 695–97, 42 L.Ed.2d 690 (1975). We also believe that a jury that satisfies this constitutional mandate is the product of selection methods that provide a fair possibility for obtaining a representative cross-section of the community. *See Williams v. Florida,* 399 U.S. 78, 100, 90 S.Ct. 1893, 1905, 26 L.Ed.2d 446 (1970).

■ The Sixth Amendment does not require that each criminal petit jury "mirror the community and reflect the various distinctive groups in the population." *Taylor,* 419 U.S. at 538, 95 S.Ct. at 702. Both random selection of potential jurors from the venire and the limited size of a jury in relation to the community it represents render impossible complete representation on any single jury. Standing alone, the fact that in the present case a jury of white citizens tried two black defendants does not violate the Sixth Amendment. For more than forty years, however, the Supreme Court has prohibited jury selection practices that systematically exclude certain potential jurors as a distinct group and result in juries that are unrepresentative of the community. The Court did not consider these Sixth Amendment authorities when it decided *Swain. See* 380 U.S. at 203–05, 85 S.Ct. at 826–27.

In *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), the Court held that systematic exclusion from a federal jury venire of all women who were not members of the Illinois League of Women Voters would violate the Sixth Amendment.

Lest the right of trial by jury be nullified by the improper constitution of juries, the notion of what a proper jury is has become inextricably intertwined with the idea of jury trial.

. . . .

Our notions of what a proper jury is have developed in harmony with our basic concepts of a democratic society and a representative government. For "It is part of the established tradition in the use of juries as instruments of public justice that the jury be a body truly representative of the community." *Smith v. Texas,* 311 U.S. 128, 130, 61 S.Ct. 164, 165, 85 L.Ed. 84 [1940].

*Id.* at 85, 62 S.Ct. at 471. The Court went on to note that even "the desire for competent jurors" must yield to "the concept of the jury as a cross-section of the community." *Id.* at 86, 62 S.Ct. at 472.

In perhaps the farthest extension of *Glasser's* articulation of the cross-section principle underlying the "American tradition of trial by jury," the Court in *Thiel v. Southern Pacific Co.,* 328 U.S. 217, 220, 66 S.Ct. 984, 985, 90 L.Ed. 1181 (1946), exercised its supervisory authority to reverse a civil judgment by a federal jury. The jury had been selected from jury lists from which all daily wage earners had been systematically excluded. The Court did not find persuasive Justice Frankfurter's dissent that "[t]he nature of the classes excluded was not such as was likely to affect the conduct of the members as jurymen." *Id.* at 229, 66 S.Ct. at 990. Instead, the Court held that:

Jury competence is an individual rather than a group or class matter. That fact lies at the very heart of the jury system. To disregard it is to open the door to class distinctions and discriminations which are abhorrent to the democratic ideals of trial by jury.

*Id.* at 220, 66 S.Ct. at 985. The guarantee of an impartial jury drawn from a cross-section of the community does not require that each jury "contain representatives of all the economic, social, religious, racial, political and geographical groups of the community." *Id.* Yet the rationale of *Thiel* equally supports our conclusion that an impartial jury is one which is selected "without systematic and intentional exclusion of any of these groups." *Id.*

Later the same year, the Court again invoked *Glasser's* cross-section of the community principle and exercised its supervisory authority to reverse a federal criminal conviction by a jury from which women had

been purposefully and systematically excluded. *Ballard v. United States*, 329 U.S. 187, 191, 193, 67 S.Ct. 261, 264, 91 L.Ed. 181 (1946). The reasoning of *Ballard* is notable in two respects. First, the Court once again, as in *Thiel*, refused to consider whether the individual defendant was actually prejudiced by the jury composition. Instead, the Court reiterated the representative purpose of a criminal jury.

> [I]t is not enough to say that women when sitting as jurors neither act nor tend to act as a class. Men likewise do not act as a class. But, if the shoe were on the other foot, who would claim that a jury was truly representative of the community if all men were intentionally and systematically excluded from the panel? The truth is that the two sexes are not fungible; a community made up exclusively of one is different from a community composed of both; the subtle interplay of influence one on the other is among the imponderables. To insulate the courtroom from either may not in a given case make an iota of difference.

*Id.* at 193–94, 67 S.Ct. at 264 (footnote omitted). The Court also stated that the actionable injury occurred to the public's interest in the integrity of the jury system.

> [T]he exclusion of women from jury panels may at times be highly prejudicial to the defendants. But reversible error does not depend on a showing of prejudice in an individual case. The evil lies in the admitted exclusion of an eligible class or group in the community.... The injury is not limited to the defendant—there is injury to the jury system, to the law as an institution, to the community at large, and to the democratic ideal reflected in the processes of our courts.

*Id.* at 195, 67 S.Ct. at 265.

Collectively, *Glasser*, *Thiel*, and *Ballard* teach that an impartial jury is the product of jury selection methods that do not systematically exclude members of a distinct group from jury service. Competence of jury service is an individual rather than a group characteristic. The violation lies in the exclusionary conduct or policy, not in any documented partiality by a particular jury. Although the defendant may benefit by reversal of the verdict, it is the integrity of the judicial system and the public's right to a democratically representative jury that are demonstrably impaired. These cases were decided before *Duncan v. Louisiana* applied the Sixth Amendment to the states. Review of subsequent instances in which the Court has applied the constitutional guarantee of an impartial jury to the states, however, reveals that the principles of *Glasser*, *Thiel*, and *Ballard* have been adopted and developed by the Court's Sixth Amendment analysis.

In *Williams v. Florida*, 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970), the Court held that the Sixth Amendment did not require that all juries consist of twelve persons. A Florida law that permitted a jury of six members in non-capital cases satisfied the Sixth Amendment because a six-person jury was large enough to "provide a fair possibility for obtaining a representative cross-section of the community." *Id.* at 100, 90 S.Ct. at 1906. The Court also emphasized the dual purpose of the jury as a safeguard for the defendant and as a body representing the community.

> [T]he essential feature of a jury obviously lies in the interposition between the accused and his accuser of the common-sense judgment of a group of laymen, and in the community participation and shared responsibility that results from the group's determination of guilt or innocence.

*Id.* In *Ballew v. Georgia*, 435 U.S. 223, 98 S.Ct. 1029, 55 L.Ed.2d 234 (1978), the opinions in which six justices joined expressed doubt that a jury of five members could represent a cross-section of the community. *Id.* at 239, 98 S.Ct. at 1038 (Blackmun, J.), 245 (White, J.), 246 (Brennan, J.).

In *Peters v. Kiff*, 407 U.S. 493, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972), six justices agreed that a white defendant had standing to challenge his conviction by a jury from which blacks allegedly were systematically excluded. The Sixth Amendment guaran-

tee of a fair possibility for obtaining a representative cross-section of the community on the jury did not govern *Peters* because the defendant's state jury trial occurred before *Duncan* applied that requirement to the states. Nevertheless, three justices concluded that the white defendant's due process right to trial before a fair tribunal had been violated if blacks had been systematically excluded. This conclusion was not grounded on a finding that the individual defendant was actually prejudiced by the jury's composition. Rather, Justice Marshall expressly determined that the injury arose from the loss of a diversity of voices and experiences on the jury during its deliberations.

> [W]e are unwilling to make the assumption that the exclusion of Negroes has relevance only for issues involving race. When any large and identifiable segment of the community is excluded from jury service, the effect is to remove from the jury room qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable. It is not necessary to assume that the excluded group will consistently vote as a class in order to conclude, as we do, that its exclusion deprives the jury of a perspective on human events that may have unsuspected importance in any case that may be presented.

*Id.* at 503–04, 92 S.Ct. at 2169 (Marshall, J., plurality). Justice Marshall also emphasized that the systematic exclusion of cognizable groups from the jury jeopardizes the integrity of the judicial process. *Id.* at 502, 92 S.Ct. at 2168.

*Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975), is the seminal authority governing the application of the Sixth Amendment to state jury trials. In *Taylor*, the Court expressly accepted "the fair-cross-section requirement as fundamental to the jury trial guaranteed by the Sixth Amendment." *Id.* at 530, 95 S.Ct. at 697. Therefore, the Court concluded that "women cannot be systematically excluded from the jury panels from which petit juries are drawn." *Id.* at 533, 99 S.Ct. at 699. The Court both expressly adopted

the rationale of *Ballard* as applicable under the Sixth Amendment and favorably quoted the *Peters* plurality. *Id.* at 532 & n. 12, 95 S.Ct. at 698 n. 12. In *Taylor*, the Court again acknowledged the dual purpose of the impartial jury: first, to guard the defendant "against the exercise of arbitrary power," and second, to make a critical contribution "to public confidence in the fairness of the criminal justice system." *Id.* at 530, 95 S.Ct. at 698. Most recently, in *Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), the Court held that a state statute that exempted women from jury service upon their request, and resulted in systematic exclusion of women, violated the Constitution's fair-cross-section requirement. 439 U.S. at 360, 99 S.Ct. at 666.

■ Our review of the Supreme Court's rationale for deciding these Sixth Amendment controversies leads to the following conclusions. The Sixth Amendment guarantees that a criminal charge will not be tried before a jury that fails to represent a cross-section of the community as a consequence of a method of jury selection that systematically excludes a cognizable group from jury service. Two rationales support this requirement. First, an impartial jury may protect the defendant from an improper conviction by bringing laypersons' common sense to bear upon the evidence supporting the prosecution's charges. Second, an impartial jury represents diverse elements of the community from which it is drawn and thereby makes a vital contribution to public confidence in the integrity and democracy of the judicial system. The impartial jury provides its safeguards during trial and, more significantly, during its deliberations. It is during deliberation that the diverse experiences of the members of a properly constituted jury are brought to bear on the often subtle nuances involved in evaluating witnesses' credibility and permissive inferences drawn from the evidence. Only in returning its verdict does the jury express the community's decision to punish or free the defendant. In short, we conclude that not only the jury list and

the members of the venire, but also each individual criminal petit jury must be the product of selection methods that provide a fair possibility for obtaining a representative cross-section of the community.

### IV.

We next make two determinations: the peremptory challenge is a jury selection tool that may be systematically used to exclude potential jurors solely because of their membership in a cognizable group; the nature of the peremptory challenge does not exempt its use from all judicial scrutiny under the Sixth Amendment. We then establish the threshold showing necessary to invoke judicial scrutiny, and the procedures that shall direct the trial court's inquiry.

It is readily apparent that currently a party may use peremptory challenges systematically rather than individually. At present, nothing prevents the prosecutor or defense counsel from deciding, perhaps before voir dire begins, to exercise every peremptory challenge to excuse potential jurors who share a single characteristic. The Supreme Court has observed that a juror's impartiality is a matter of his or her individual "state of mind," *Irvin v. Dowd*, 366 U.S. 717, 724, 81 S.Ct. 1639, 1643, 6 L.Ed.2d 751 (1961) (quoting *United States v. Wood*, 299 U.S. 123, 145–46, 57 S.Ct. 177, 185, 81 L.Ed. 78 (1936)), rather than the skin color, gender, nationality, or similar characteristic that identifies the person as a member of a distinct group. The Supreme Court's Sixth Amendment analyses uniformly refuse to countenance a presumption that jurors will reach their verdict as a result of a partiality arising from their group identity. Therefore, the peremptory challenge, when systematically exercised, is a tool of jury selection that is capable of obstructing the Sixth Amendment's guarantee of an impartial jury.

The nature of the peremptory challenge does not exempt its abuse from scrutiny under the Sixth Amendment. First, as the Court observed in *Swain*, the peremptory challenge is a statutory right that Congress or any state legislature could abolish at will. *Swain*, 380 U.S. at 219, 85 S.Ct. at 835 (quoting *Stilson v. United States*, 250 U.S. 583, 586, 40 S.Ct. 28, 29, 63 L.Ed. 1154 (1919)). *See also Rosales-Lopez v. United States*, 451 U.S. 182, 188 n. 6, 101 S.Ct. 1629, 1634 n. 6, 68 L.Ed.2d 22 (1981) (plurality). Second, nothing in the rationales of the Supreme Court's decisions on jury impartiality suggests a reason to exempt peremptory challenges from scrutiny if their systematic use in a particular case obstructs the formation of an impartial jury. Third, as a statutory tool, the peremptory challenge is designed to further the Sixth Amendment's goal of creating an impartial jury; abuse of the peremptory challenge undermines its very reason for existing. Fourth, as the Second Circuit has noted, *Swain* does not insulate the peremptory challenge from all scrutiny, even under the Equal Protection Clause. *Swain* required a showing of systematic abuse of peremptory challenges in case after case.

> Part III of the *Swain* opinion, although dictum, set forth the circumstances that a defendant would have to show in order to subject the prosecution's use of peremptories to inquiry by the court.... [E]ven the *Swain* Court did not believe that peremptory challenges are immune from remedial judicial action....

*McCray v. Abrams*, 750 F.2d at 1130. For these reasons, we conclude that peremptory challenges are not exempt from judicial scrutiny to enforce the Sixth Amendment.

The nature of the peremptory challenge, as explicated in *Swain*, and the nature of the Sixth Amendment's guarantee of an impartial jury do place two substantive limitations upon judicial inquiry into abuse of the peremptory challenge. First, *Swain* unequivocally states that peremptory challenges must not be scrutinized *individually* for reasonableness or sincerity. 380 U.S. at 222, 85 S.Ct. at 837. Such an inquiry would destroy the peremptory challenge's utility as a tool that may be exercised on the basis of an inarticulate suspicion that a particular juror is partial or for no reason at all, thus supplementing the

challenge for cause. By contrast, however, the systematic exclusion of members of a distinct group from the jury will rarely be the product of "no reason." The impermissible view that members of a certain group are unqualified to serve as jurors will generally be the origin of systematic exclusion. If judicial scrutiny is only triggered by a party's *systematic* use of peremptory challenges to exclude members of a distinct and identified group, trial counsel for both the public and the defendant will retain broad discretion "to excuse jurors to whom, on the basis of their personal history or behavior, some bias may be imputed." *McCray*, 750 F.2d at 1131.

*Swain* teaches a second lesson about the nature of the peremptory challenge. It is a powerful tool with which to shape the jury that sits to determine guilt and innocence and, therefore, peremptory challenges should be authorized and controlled in a manner that insures "not only freedom from any bias against the accused, but also from any prejudice against his prosecution." *Swain*, 380 U.S. at 220, 85 S.Ct. at 835 (quoting *Hayes v. Missouri*, 120 U.S. 68, 70, 7 S.Ct. 350, 351, 30 L.Ed. 578 (1887)). We construe the Sixth Amendment's guarantee of impartiality to require no less. The Supreme Court has repeatedly reversed verdicts rendered by improperly constituted juries not only on the ground that the defendant was injured, but also on the ground that an improperly unrepresentative jury impairs the public's interest in a jury system of manifest integrity. *See, e.g., Ballard*, 329 U.S. at 195, 67 S.Ct. at 265; *Taylor*, 419 U.S. at 530, 95 S.Ct. at 697.[3]

■ We conclude that a prosecutor's systematic use of peremptory challenges to excuse members of a cognizable group from a criminal petit jury offends the Sixth Amendment's protection of the defendant's interest in a fair trial and the public's interest in the integrity of judicial process, as well as the prosecutor's special duty as "the servant of the law" to see that "guilt shall not escape or innocence suffer." *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935). Although the Sixth Amendment by its terms protects the right of "the accused" to trial by an impartial jury, it does not guarantee a criminal defendant the right to trial before a jury that is partial to his cause. The spectacle of a defense counsel systematically excusing potential jurors because of their race or other shared group identity while the prosecutor and trial judge were constrained merely to observe, could only impair the public's confidence in the integrity and impartiality of the resulting jury. Therefore, we hold that under the Sixth Amendment, neither prosecutor nor defense counsel may systematically exercise peremptory challenges to excuse members of a cognizable group from service on a criminal petit jury.

Our next task is to establish the procedures by which a Sixth Amendment violation arising out of an abuse of peremptory challenges will be demonstrated and remedied. In each case, the presumption will operate initially that both parties are exercising their peremptory challenges in a nondiscriminatory manner. To invoke the trial court's authority to examine the use of peremptories, a party must make a timely motion for a mistrial. The time for such a motion will generally end upon the completion of the jury selection process.

**3.** Although the supreme courts of Florida, Massachusetts, and California have departed from *Swain*, each has also recognized its two vital lessons. In *State v. Neil*, 457 So.2d 481 (Fla. 1984); *Commonwealth v. Soares*, 377 Mass. 461, 387 N.E.2d 499, *cert. denied*, 444 U.S. 881, 100 S.Ct. 170, 62 L.Ed.2d 110 (1979); and *People v. Wheeler*, 22 Cal.3d 258, 148 Cal.Rptr. 890, 583 P.2d 748 (1978), state courts subjected peremptory challenges to judicial review. In each instance, however, the court required a showing that peremptory challenges were being systematically used to strike jurors solely because of a shared group characteristic before the trial court was authorized to inquire into a party's discretion. *Neil*, 457 So.2d at 486; *Soares*, 387 N.E.2d at 517; *Wheeler*, 148 Cal.Rptr. at 906, 583 P.2d at 764. In each instance the state court imposed the limitation equally upon prosecution and defense. *See Wheeler*, 148 Cal.Rptr. at 906, 583 P.2d at 764; *Neil*, 457 So.2d at 487; *Soares*, 387 N.E.2d at 516.

■ A party establishes a prima facie case of a Sixth Amendment violation when the party demonstrates that:

> (1) the group alleged to be excluded is a cognizable group in the community, and (2) there is a substantial likelihood that the challenges leading to this exclusion have been made on the basis of the individual venirepersons' group affiliation rather than because of any indication of a possible inability to decide the case on the basis of the evidence presented.

*McCray,* 750 F.2d at 1131–32. This standard is adapted from the test established by the Supreme Court in *Duren v. Missouri,* 439 U.S. at 364, 99 S.Ct. at 668, with respect to the jury venire. As the language of *Thiel* cited above at p. 768 illustrates, there are numerous "cognizable" groups in a community.

Only if the moving party establishes a prima facie showing of systematic abuse of peremptory challenges, which the trial court shall find on the record, does the burden shift to the non-moving party to respond to any inquiry concerning its exercise of that right. Preservation of the distinctive character of peremptory challenges requires that the non-moving party need not show a reason rising to the level of cause for excusing the prospective jurors in order to rebut the moving party's prima facie case. As the Second Circuit has observed:

> There are any number of bases on which a party may believe, not unreasonably, that a prospective juror may have some slight bias that would not support a challenge for cause but that would make excusing him or her desirable. Such reasons, if they appear to be genuine, should be accepted by the court, which will bear the responsibility of assessing the genuineness of the [non-moving party's] response and of being alert to reasons that are pretextual.

*McCray,* 750 F.2d at 1132 (citation omitted). *See also Wheeler,* 148 Cal.Rptr. at 902, 583 P.2d at 760–61. If the trial court

finds that the non-moving party's explanation of its use of peremptory challenges does not rebut the moving party's prima facie case of a Sixth Amendment violation, the judge will declare a mistrial, and a new jury will be selected from prospective jurors who were not previously associated with the case.

These measures will remove one more barrier to the realization of the Sixth Amendment's guarantee that criminal charges will be tried to an impartial jury. The cost of this increased equity is minimal, particularly when weighed against the importance of maintaining the integrity of the jury system.[4] We concur in the Second Circuit's expectation that the instances requiring invocation of these procedures will be rare, and its hope that the number will decline. *McCray,* 750 F.2d at 1132.

### V.

■ A review of the record reveals that the state trial judge and the parties followed the procedures we have established and the trial court found that the parties systematically exercised their peremptory challenges on the basis of race. The trial judge would have ordered a mistrial except that he did not deem himself empowered to do so. First, the defense counsel raised the issue through a timely motion for a mistrial, to which the trial court responded by conferring with both the prosecutor and the defense counsel. Second, each party identified the cognizable group that the other allegedly had systematically excused. The prosecution allegedly excused black prospective jurors, and the defense allegedly excused white prospective jurors. Third, the pattern of racial exclusion by each party establishes more than "a substantial likelihood" that the peremptory challenges were exercised on the basis of group affiliation. Twenty-two of the twenty-six peremptory challenges that the prosecutor exercised were used to excuse blacks. Thirty-seven of the forty peremptory challenges that the defendants exer-

---

**4.** We do not share the Seventh Circuit's view that voir dire will regularly become "a Title VII proceeding in miniature." *United States v. Clark,* 737 F.2d 679, 682 (7th Cir.1984).

cised in combination were used to excuse whites.

Fourth, the trial court gave each party ample opportunity to rebut the allegations that it had systematically exercised its peremptory challenges to discriminate racially. The prosecutor openly acknowledged that he excused prospective jurors because of their race: defense counsel "gave it to me, so I'm going to give it to them." Tr. at 381. The systematic nature of the prosecutor's strategy became clear when he tacitly acknowledged reserving his peremptory challenges "until they had less challenges than I." Tr. at 381. *See also* tr. at 385. Rather than describe any potential partiality that he suspected individual veniremen of harboring, the prosecutor attempted to excuse his conduct by claiming that the defense counsel "started the game, I had to play it." Tr. at 386. *See also* tr. at 382. The prosecutor's acknowledged conduct alone would justify a mistrial.

After evaluating the parties' responses, and apparently rejecting the defense counsels' claims as pretextual, the trial court found that both the prosecution and the defense had systematically exercised their peremptory challenges to exclude prospective jurors on the basis of race. It is clear that the state judge would have granted a mistrial if he had considered it an authorized alternative.

Let me indicate to you my personal observations.

I have noted, of course, that the Prosecutor has used his peremptory challenges for the most part to exclude black jurors.

By the same token the lawyers for the Defendants conversely used their peremptory challenges for the purpose of excluding white jurors.

Those are the observations that I have formed in the three days.

And my personal feeling is that I disagree with both of your strategy. And I think it is quite evident that you can get a fair jury with people of both races. And I don't think there's any argument about that.

However, I have no control over the challenges that the Prosecutor uses.

When I say challenges, I mean peremptory. I have no control over the peremptory challenges that the defense lawyers use.

. . . .

And I have no alternative under the existing law, I deny the motion for mistrial.

Tr. at 389–90. The trial court found the facts necessary to support the legal conclusion that the jury which resulted from the open battle of peremptory challenges was not impartial within the meaning of the Sixth Amendment.

Therefore, we reverse the district court and remand this case with directions to issue the writ Booker seeks unless the State of Michigan retries him within sixty days from the issuance of our mandate or within such further time as the district court may allow for good cause shown.