**UNITED STATES of America ex rel. Cornett KYLES, Plaintiff,**

v.

**Michael O'LEARY, Warden and Neil F. Hartigan, Attorney General of the State of Illinois, Defendants.**

No. 85 C 5599.

United States District Court, N.D. Illinois, E.D.

July 17, 1986.

Cornett Kyles, pro se.

Joan G. Fickinger, Asst. Atty. Gen., Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

Petitioner Cornett Kyles, a black man, was convicted by a jury in Illinois state court for the murder of Carol Jewell, a white woman who was his common law wife, and is now serving a fifty year prison sentence. An Illinois appellate court af-firmed his conviction in an unpublished order, *People v. Kyles*, 125 Ill.App.3d 1162, 89 Ill.Dec. 810, 481 N.E.2d 361 (1st Dist. 1984), and after being denied leave to appeal to the Illinois Supreme Court, Kyles petitioned this Court for a writ of habeas corpus under 28 U.S.C. § 2254 (1982). Kyles states three grounds for relief in his petition. First, he argues that the state trial judge's failure to give the jury an instruction on the lesser-included offense of involuntary manslaughter violated his due process rights under the Fifth and Fourteenth Amendments. Second, Kyles asserts that he was denied a full hearing on appellate review of his conviction. Finally, he maintains that in trying him for murder, the state prosecutors used peremptory challenges to exclude potential black jurors in violation of Kyles' Sixth and Fourteenth Amendment rights to an impartial jury. The parties have filed cross-motions for summary judgment. Because the Court finds that none of these claims supports the issuance of a habeas corpus writ, respondents' motion for summary judgment is granted, and Kyles' motion for summary judgment is denied.

## FACTUAL BACKGROUND [1]

On March 23, 1982, Kyles returned from work to the building where he and Carol Jewell shared an apartment and found Jewell in the apartment of Sara Oliver, a neighbor. Kyles entered Oliver's apartment, looked at Jewell and said that he thought she had been drinking. Kyles left Oliver's apartment for a short time and returned to accuse Jewell of taking his money to purchase liquor. He dragged her by the hair out of the chair where she was sitting and began to strike and kick her in the head and chest. This beating continued for ten to fifteen minutes. Kyles then dragged Jewell to their apartment. Oliver testified at trial that for the next ninety minutes she heard sounds from Kyles' apartment of somebody being struck while Jewell cried

---

**1.** There are no genuine issues of fact regarding the circumstances of Jewell's death. Although factual disputes may exist regarding the voir dire and the prosecutors' reasons for excluding black prospective jurors, summary judgment is nevertheless appropriate since, even resolving these factual disputes in favor of Kyles, we find no constitutional violation.

out, "Stop, Ray [Kyles nickname]." Kyles testified that he had indeed beaten Jewell in the chest and face and kicked her in the buttocks for a period which he said lasted from thirty to forty-five minutes. He admitted that Jewell did not try to defend herself because she was too weak. Oliver further testified that at 2:00 a.m. on March 24, 1982, she was awakened by the sound of Jewell's cries and moans which lasted for approximately twenty minutes. At 5:00 a.m., Kyles came to Oliver's apartment and asked her to call the police. Emergency personnel arrived at the scene somewhat later, but they were unable to revive Jewell there or at the hospital where she was pronounced dead.

At trial, Dr. Tae An, the examining pathologist, testified that Jewell's face, elbows, buttocks and legs were covered with bruises and abrasions and that ten of her ribs had been broken. In Dr. An's opinion, Jewell's death was the result of multiple blunt trauma with massive subcutaneous (under the skin) hemorrhaging and hemothorax (bleeding in the chest).

An information was returned charging Kyles with the murder of Jewell. At the voir dire, state prosecutors exercised eight peremptory challenges to members of the venire. Six of these were used to strike black venirepersons. Kyles used one of his peremptory challenges to exclude a black person. Kyles twice moved unsuccessfully for a mistrial based on what he claimed was the prosecutors' systematic use of peremptory challenges to exclude blacks from the jury. Kyles ended up with an all-white jury which convicted him of Jewell's murder.

Following his conviction and unsuccessful appeal, Kyles was denied leave to appeal to the Illinois Supreme Court. Thus, he had exhausted all his state remedies as required by 28 U.S.C. § 2254(b) (1982) prior to his filing this petition for habeas corpus.[2] We now proceed to the merits of the habeas corpus petition.

## PETITIONER'S CLAIM

### I. Trial Court's Refusal to Give Involuntary Manslaughter Instruction

At the close of trial, Kyles requested an instruction on the lesser-included offense of involuntary manslaughter.[3] However, the presiding judge refused and instructed the jury only on the elements of murder. Thus, the jury had only the option to convict or acquit Kyles of murder. The constitutional underpinning of Kyles' claim is that the trial court's refusal to issue the involuntary manslaughter instruction amounted to a violation of Kyles' due process rights under the Fifth and Fourteenth Amendments. The standard in this Circuit for reviewing due process claims arising from the failure to give lesser-included offense instructions was first established in *United States ex rel. Peery v. Sielaff*, 615 F.2d 402, 404 (7th Cir.1979), *cert. denied*, 446 U.S. 940, 100 S.Ct. 2163, 64 L.Ed.2d 794 (1980). In *Sielaff*, the Seventh Circuit declared that no due process violation has occurred unless the petitioner has alleged a " 'fundamental defect which inherently re-

---

**2.** We note that Kyles failed to pursue state post-conviction remedies with respect to the issues raised in his petition. However, exhaustion of state post-conviction remedies is not necessary where such an effort would be futile. Where, as here, the issues presented in a habeas corpus petition were raised and rejected on appeal from the state trial court, post-conviction remedies are deemed futile since the appellate court decision would be *res judicata* as to those issues actually decided. *Perry v. Fairman*, 702 F.2d 119, 121 (7th Cir.1983); *United States ex rel. Shiflet v. Lane*, 625 F.Supp. 677, 682 n. 9 (N.D. Ill.1985).

**3.** Kyles states in his *pro se* petition that his constitutional claim is predicated on the trial court's failure to give a jury instruction on involuntary manslaughter. This was his position at trial and on direct appeal in state court. However, in his brief in support of summary judgment, Kyles raises for the first time the argument that a *voluntary* manslaughter instruction should have been given. Nevertheless, he cites the Illinois involuntary manslaughter statute in his brief as the applicable state provision. We proceed based on the assumption that Kyles intended to argue that the jury should have been instructed on involuntary manslaughter.

sults in a complete miscarriage of justice [or] an omission inconsistent with the rudimentary demands of fair procedure.' " (*citing Hill v. United States*, 368 U.S. 424, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962)). This standard enjoys continued validity today. *Nichols v. Gagnon*, 710 F.2d 1267 (7th Cir.1983), *cert. denied*, 466 U.S. 940, 104 S.Ct. 1918, 80 L.Ed.2d 465 (1984).

■ After reviewing the trial record, we find that no fundamental miscarriage of justice resulted from the court's refusal to give an involuntary manslaughter instruction. Kyles contends that there is evidence that he acted recklessly and not intentionally, thus warranting an instruction on involuntary manslaughter. The primary evidence which Kyles points to regarding recklessness is his testimony at trial denying that he intended to hurt Jewell.[4] He also contends in his petition that the following evidence suffices to require an involuntary manslaughter instruction: (1) the beating occurred pursuant to a domestic fight; (2) he did not beat Jewell until she was unconscious or dead; (3) the main injuries were at the ribs and buttocks rather than the head; (4) the bruises would not have been evident until several hours after the beating; and (5) had Jewell received prompt medical treatment her wounds might have been treatable.

Under Illinois law, a defendant is entitled to an instruction on involuntary manslaughter where there is some credible evidence in the record which would reduce the crime from murder to manslaughter. *People v. Ward*, 101 Ill.2d 443, 451, 79 Ill.Dec. 142, 145, 463 N.E.2d 696, 699 (1984). The Illinois Criminal Code sets forth the following definition of murder which is relevant here.

(a) A person who kills an individual without lawful justification commits murder if, in performing the acts which cause the death:

(1) He either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or (2) He knows that such acts create a strong probability .of death or great bodily harm to that individual or another....

Ill.Rev.Stat. ch. 38, § 9–1(a)(1)–(2) (1985). Involuntary manslaughter, on the other hand is defined as follows.

(a) A person who unintentionally kills an individual without lawful justification commits involuntary manslaughter if his acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individual, and he performs them recklessly....

Ill.Rev.Stat. ch. 38, § 9–3(a) (1985). Thus, in order for Kyles to have been entitled to an involuntary manslaughter instruction, he would have had to produce credible evidence showing that he acted recklessly rather than intentionally (or with knowledge that his acts created a strong probability of Jewell's death or great bodily harm to her).

It is readily apparent that none of the evidence to which Kyles refers justifies an instruction on involuntary manslaughter. His testimony that he did not intend to kill or hurt Jewell, *supra* note 4, is not sufficient to warrant such an instruction. Illinois courts have rejected claims based on similar "no intent" testimony where. other evidence overwhelmingly indicates an intent to kill or do great bodily harm. *See, e.g., Ward*, 101 Ill.2d at 451–52, 79 Ill.Dec. at 146, 463 N.E.2d at 700 (1984); *People v. Cannon*, 49 Ill.2d 162, 166, 273 N.E.2d 829, 831 (1971). In the present case, the evidence shows that Kyles administered a fatal beating to the victim over the course of at least two hours. Furthermore, the victim's extensive injuries demonstrate that Kyles intended to kill or do great bodily

---

**4.** Kyles relies on the following exchange between himself and the prosecutor at trial:

PROSECUTOR: But you did intend to hurt her [Jewell], didn't you?
KYLES: No.

\* \* \* \* \* \*

PROSECUTOR: You weren't trying to hurt her then, though, were you?
KYLES: Well, I was just angry.
Tr. at 463, 465.

harm to Jewell or at least that he knew that his repeated acts of hitting and kicking Jewell created a strong probability of death or great bodily harm.

Furthermore, the other evidence on which Kyles relies was not sufficient to justify an involuntary manslaughter instruction. Kyles' testimony that he did not beat Jewell until she was dead or unconscious does not in itself exhibit a lack of intent. Moreover this was not an incident where the defendant had a brief emotional outburst and then pulled back. Kyles beat Jewell in Oliver's apartment, stopped and again began beating her in their apartment for an extensive period. In addition, the fact that the location of the primary injuries causing death was the buttocks rather than the head hardly clears Kyles of an intent to do great bodily harm. The evidence at trial demonstrated that he continually beat and kicked Jewell about the head, chest, stomach and buttocks. Finally, any evidence that Jewell's bruises were slow to appear or that her wounds *might* have been treatable are simply irrelevant to whether Kyles intended to kill or do great bodily harm to her. Kyles must have been aware that he was doing grave harm to the victim, as she was screaming and pleading with him to stop.

Thus, we cannot conclude that the trial court's failure to give a manslaughter instruction constituted a fundamental miscarriage of justice such that any due process implications would arise. Accordingly, on this aspect of the cross-motions for summary judgment, the respondents' motion is granted and Kyles' motion is denied.

## II. Adequacy of Hearing on Appellate Review

■ In his petition, Kyles listed as one of the issues for habeas corpus review: "Whether the appellate court found and reviewed the material factors and provided petitioner with a full and round [sic] hearing?" No further argument was made in this regard in any other papers filed with this Court by Kyles. Although *pro se* habeas corpus petitions are to be interpreted liberally, a petitioner must still allege a violation of a specific federal constitutional right. *United States ex rel. White v. DeRobertis*, 566 F.Supp. 871, 873 (N.D.Ill.1983), *aff'd*, 753 F.2d 1078 (7th Cir.1985); *see* 28 U.S.C. § 2254(a) (1982). Because Kyles has failed to allege a cognizable constitutional violation or any facts to support any such claim with respect to his appeal in the state courts, we grant respondents' summary judgment motion and deny Kyles' motion on this issue.

## III. Prosecutors' Use of Peremptory Challenges to Exclude Black Venirepersons

The most important aspect of Kyles' petition is his allegation that in conducting the voir dire the state prosecutors used their peremptory challenges to systematically exclude black venirepersons from the petit jury, thus depriving Kyles of his Sixth and Fourteenth Amendment rights to a fair and impartial jury in a criminal trial. After the summary judgment motions here became fully briefed, this Court stayed ruling on the motions pending the Supreme Court's decision in *Batson v. Kentucky*, 471 U.S. 1052, 105 S.Ct. 2111, 85 L.Ed.2d 476 (1985) (order granting *certiorari* ), which was supposed to resolve the very issue on which Kyles based this part of his petition. On April 30, 1986, the Supreme Court declared that "the *Equal Protection Clause* forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." *Batson v. Kentucky,* —— U.S. ——, 106 S.Ct. 1712, 1719, 90 L.Ed.2d 69 (1986) (emphasis added). Rather than clarifying the issue, however, the Supreme Court has clouded the question of the continued validity of other courts' analyses declaring racially-based exclusion of jurors by prosecutors to be a violation of the Sixth Amendment. Accordingly, this Court must address this part of the petition in three steps. First, we must determine whether, under *Batson,* Kyles has presented a *prima facie* case of a violation of the Equal

Protection Clause. Second, we must address the question of whether *Batson* should be applied retroactively to individuals lodging collateral attacks on final convictions. Finally, we must independently assess, whether as he has claimed, Kyles' Sixth Amendment rights to an impartial jury and a jury drawn from a fair cross-section of the community have been violated independent of any equal protection claim. This Court finds, as discussed below, that although Kyles appears to have a *prima facie* case for an equal protection violation, *Batson* should not be applied retroactively with respect to collateral review of final convictions. We also hold that, in light of recent developments in Sixth Amendment jurisprudence, Kyles states no independent claim for a violation of his Sixth Amendment rights. Accordingly, the respondents' summary judgment motion is granted, and Kyles' cross-motion is denied.

### A. Equal Protection Claims

In *Batson v. Kentucky,* — U.S. —, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the Supreme Court ruled that a criminal defendant's equal protection rights are violated where prosecutors' employ peremptory challenges solely on the basis of race to strike persons of the defendant's race at voir dire. In doing so, the Court overturned its twenty-two year old decision in *Swain v. Alabama,* 380 U.S. 202, 223, 85 S.Ct. 824, 837, 13 L.Ed.2d 759 (1965), which had taken a much stricter approach requiring defendants to show a systematic pattern over time of exclusion of potential jurors of the defendant's race to establish a violation of the equal protection clause. Throughout the period between the *Swain* and *Batson* opinions, the restrictive teachings of *Swain* were the target of a barrage of criticism both from the academic community and the state and federal benches. *See, e.g.,* Note, *Affirmative Selection: A New Response to Peremptory Challenge Abuse,* 38 Stan.L.Rev. 781 (1986); Comment, *Swain v. Alabama: A Constitutional Blueprint for the Perpetuation of the All-White Jury,* 52 Va.L.Rev. 1157 (1966); *McCray v. Abrams,* 750 F.2d 1113 (2d Cir. 1984); [5] *People v. Wheeler,* 22 Cal.3d 258, 583 P.2d 748, 148 Cal.Rptr. 890 (1978). State courts and lower federal courts began to address the problems embodied in peremptory challenge abuse in terms of the Sixth Amendment and under state constitutions. A split developed in the federal circuits, with some courts holding that the *Swain* analysis precluded challenges to the peremptory exclusion of racial minorities under the Sixth Amendment as well, *see, e.g., United States v. Childress,* 715 F.2d 1313 (8th Cir.1983), *cert. denied,* 464 U.S. 1063, 104 S.Ct. 744, 79 L.Ed.2d 202 (1984), and others declaring the same conduct to be an unconstitutional deprivation of the defendant's right to an impartial jury and jury selected from a fair cross-section of the community. *Booker v. Jabe,* 775 F.2d 762 (6th Cir.1985); *McCray v. Abrams,* 750 F.2d 1113 (2d Cir.1984). When the Supreme Court granted *certiorari* in *Batson,* it appeared that the conflict would be resolved, since the question presented for appeal involved only the Sixth Amendment impartial jury and fair cross-section requirements. *See Batson v. Kentucky,* 53 U.S.L.W. 3784 (U.S. Apr. 30, 1985) (question presented). Nonetheless, a majority of the Court chose to take the opportunity to overrule *Swain* and declare the challenged state conduct unconstitutional under the Fourteenth Amendment equal protection clause rather than under the Sixth Amendment.

Justice Powell, writing for the Court, articulated the factors which a defendant contesting the use of peremptories to exclude members of her race must show in order to establish a *prima facie* case of unconstitutional discrimination in the selection of the petit jury. First, the defendant must show that he or she is a member of a cognizable racial group and that the prosecutor exercised her peremptories to exclude venire members of the defendant's race. *Batson,* 106 S.Ct. at 1723. Second, the

---

**5.** The Supreme Court recently granted *certiorari* in *McCray* and vacated and remanded the case for consideration in light of *Batson,* 39 Cr.L. 4091 (U.S. June 30, 1986).

Court acknowledged a presumption that peremptory challenges can be used to discriminate by those who intend to do so. *Id.* Third, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude venirepersons from the petit jury on the basis of their race. *Id.*

■ In the present case, it appears from this Court's review of the record that Kyles has demonstrated a *prima facie* case of unconstitutional jury discrimination under *Batson*. The prosecutors exercised their peremptories to exclude six black persons from the petit jury, and there is no question that blacks represent a cognizable racial group. Furthermore, as Kyles' attorney pointed out at trial, the racial composition of the jury was particularly important in this case since the defendant was black and the victim was white. This represents another "relevant circumstance" under *Batson* which would support the inference that race was the motivating factor for the prosecutors' use of their peremptory challenges. Of course, even if Kyles has established a *prima facie* case, the respondents would have the opportunity, and indeed the burden, to come forward with evidence demonstrating a neutral explanation for excluding the black venirepersons. While this burden may be met with something less than the standard for striking jurors for cause, the state officials must offer an explanation based on something other than race or "intuition" for their actions. *See Batson*, 106 S.Ct. at 1723. While this procedure may somewhat limit the effectiveness of the peremptory challenge, the Court has declared that the interests promoted by the statutorily-created peremptory challenge are subservient to the constitutionally-based right to an impartial jury.

Having said this, we observe that although Kyles appears to have met the *Batson prima facie* test, he may not rely on the standards set forth in that decision unless the effect of the legal conclusions articulated therein are deemed by the courts to operate retroactively. In a recent *per curiam* opinion, the Supreme Court addressed the retroactivity of *Batson* to individuals bringing collateral attacks on convictions which have become final. *Allen v. Hardy*, — U.S. —, 106 S.Ct. 2878, 92 L.Ed.2d 199 (1986). The Court concluded that *Batson* should not be applied retroactively on collateral review of convictions that became final before that opinion was announced. *Id.; see also, Simpson v. Massachusetts*, 795 F.2d 216 (1st Cir.1986); *Esquivel v. McCotter*, 791 F.2d 350 (5th Cir. 1986). In this context, a conviction is final where a judgment of conviction has been rendered, the availability of appeal exhausted and the time for filing a petition for *certiorari* to the United States Supreme Court has lapsed. *Allen*, — U.S. at —, 106 S.Ct. at 2878. Kyles was denied leave to appeal to the Illinois Supreme Court on October 2, 1984. He did not file a petition for *certiorari* with the United States Supreme Court, and the time for doing so has long since passed. *See* Supreme Court Rule 20.1. Accordingly, his conviction is "final," and we may not, on habeas review, rely on the standards established in *Batson* to afford Kyles with a hearing to determine the legitimacy of the state prosecutors' conduct at his trial.[6]

■ Notwithstanding the non-retroactivity of *Batson* on collateral review of state convictions with respect to the issue of equal protection, we must address independently the question of whether Kyles has stated a claim for violation of his Sixth and Fourteenth Amendment rights to an impartial jury and jury drawn from a fair cross-section of the community. The Sixth Amendment is the constitutional foundation on which Kyles has rested his claim and the question of whether, as an alterna-

---

**6.** Shortly after the opinion in *Batson* was issued, the Supreme Court granted *certiorari* in two cases to address the question of whether that decision will operate retroactively to the benefit of individuals whose convictions were being challenged on direct appeal at the time *Batson* was decided. *Griffin v. Kentucky*, — U.S. —, 106 S.Ct. 2274, 90 L.Ed.2d 717 (1986); *Brown v. United States*, — U.S. —, 106 S.Ct. 2275, 90 L.Ed.2d 718 (1986).

tive to the *Batson* holding, prosecutorial exclusion of black jurors may independently violate that provision is properly before us.

In *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975), the Supreme Court first recognized the principle, derived from the Sixth Amendment guarantee of an impartial jury in criminal trials, that the panels from which criminal juries are drawn must be composed of a fair cross-section of the community. Furthermore, state conduct which artificially limits the participation of certain distinct groups from those panels unconstitutionally infringes the Sixth Amendment rights of criminal defendants. The fundamental logic of the principles laid out in *Taylor* has been extended in a limited context by courts addressing the problem of exclusion of particular groups at the voir dire stage. Prior to the *Batson* decision, Courts of Appeal in two circuits declared the state's use of peremptory challenges to exclude members of a criminal defendant's race from the petit jury to be a violation of the Sixth Amendment right to an impartial jury as applied to the states through the Fourteenth Amendment.[7] *Booker v. Jabe*, 775 F.2d 762 (6th Cir.1985); *McCray v. Abrams*, 750 F.2d 1113 (2d Cir.1984).[8]

Courts in other circuits have ruled differently, finding that the fair cross-section requirement first articulated in *Taylor* has never been extended to apply to the composition of the petit jury. *See, e.g., United States v. Childress*, 715 F.2d 1313 (8th Cir.1983), *cert. denied*, 464 U.S. 1063, 104 S.Ct. 744, 79 L.Ed.2d 202 (1984); *Weathersby v. Morris*, 708 F.2d 1493 (9th Cir.1983), *cert. denied*, 464 U.S. 1046, 104 S.Ct. 719, 79 L.Ed.2d 181 (1984). However, these courts relied heavily on the continued validity of *Swain*. Furthermore, the language which they cite from *Taylor* in support of the proposition that the Sixth Amendment can never be interpreted to extend to the petit jury selection does not actually foreclose the use of the Sixth Amendment to challenge particular discriminatory exclusions.[9] Both *Childress* and *Weathersby* cite the following passage from *Taylor* as determinative of the Sixth Amendment peremptory challenge question: "It should also be emphasized that in holding that petit juries must be drawn from a source fairly representative of the community we impose no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population. Defendants are not entitled to a jury of any particular composition ... but the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." *Taylor*, 419 U.S. at 538, 95 S.Ct. at 702, *cited in Childress*, 715 F.2d at 1320, and *Weathersby*, 708 F.2d at 1497.[10] It seems overly simplistic to conclude that because the Constitution does not require a rigid rule that a criminal defendant's petit jury be composed of a group of individuals proportionally representative of a community's racial, ethnic, religious and sexual demographics it must follow that a defend-

---

7. The right to an impartial jury in a criminal prosecution guaranteed by the Sixth Amendment was extended through the Fourteenth Amendment to individuals in state proceedings in *Duncan v. Louisiana*, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968).

8. Furthermore, in a decision which was never released, the Seventh Circuit apparently made a similar ruling in *United States ex rel. Teague v. Lane*, 779 F.2d 1332 (7th Cir.1985), which that Court immediately voted to rehear *en banc* pursuant to Circuit Rule 16(e). *See United States ex rel. Teague v. Lane*, 779 F.2d 1332 (7th Cir.1985) (Cudahy, J. dissenting from order for rehearing *en banc*). That case is still pending before the Seventh Circuit.

9. Moreover, in *Weathersby* the state court record indicated that the prosecutor, in response to defendant's motions for a mistrial, had offered explanations aside from race which supported his peremptory challenges to several black venirepersons. 708 F.2d at 1497. Thus, the defendant there might not even have been able to meet the *prima facie* test of *Batson*.

10. Nevertheless, even the *Childress* court recognized that the extension of Taylor from the venire to the petit jury "has much logical and practical appeal." 715 F.2d at 1319.

ant may never challenge the improper discriminatory use of peremptory jury challenges by the prosecutors which may nullify completely, at least for that defendant, the fair cross-section requirement set forth in *Taylor.*

Nevertheless, in a recent decision, a majority of the Supreme Court refused to adopt the position that the fair cross-section requirement can ever be used to invalidate the use of either "for cause" or peremptory challenges to prospective jurors, or to require petit juries, as opposed to venires, to reflect the composition of the community at large. *Lockhart v. McCree,* —— U.S. ——, 106 S.Ct. 1758, 1764, 90 L.Ed.2d 137 (1986). In *Lockhart,* a convicted murderer challenged the state's removal for cause at the guilt phase of his bifurcated capital trial venirepersons whose opposition to capital punishment was so strong that it would affect their ability to perform their duties at the sentencing phase of trial. One of the petitioner's claims was that this practice denied him his Sixth Amendment right to a jury drawn from a fair cross-section of the community. However, Justice Rehnquist, writing for a majority of the Court, argued that the fair cross-section requirement is a principle which protects only the composition of the venire. *Id.* at 1764–65. Extension of that requirement to petit juries, he wrote, would be both unworkable and unsound. *Id.* Apparently, the Court was unconcerned with the possibility, recognized by other courts, that in individual cases the fair cross-section requirement could be subverted through the improper use of peremptory challenges. *See, e.g., Booker,* 775 F.2d at 771; *McCray,* 750 F.2d at 1128–29; *see also,* Note, *Affirmative Selection: A New Response to Peremptory Challenge Abuse,* 38 Stan.L.Rev. 781, 801 (1986) ("No matter how representative the jury pool and the venire, given enough peremptories, the parties can alter significantly the composition of the jury"), and *McCray v. New York,* 461 U.S. 961, 967–68, 103 S.Ct. 2438, 2442, 77 L.Ed.2d 1322 (1983) (Marshall and Brennan, J.J., dissenting from denial of *certiorari*). The *Lockhart* decision thus seems to foreclose what was explicitly not addressed in *Batson. See Batson,* 106 S.Ct. at 1716 n. 4 (expressing no view on the merits of the petitioner's Sixth Amendment claims with respect to prosecutors' employment of peremptory challenges to exclude venirepersons of the petitioner's race). To the extent that this outcome might otherwise exact a discriminatory result on future defendants who are members of minority racial groups, the *Batson* equal protection right will provide protection. This Court's reading of *Lockhart,* then, requires us to reject Kyles' claim that his Sixth Amendment rights may have been violated by the prosecutors' use of six of their eight peremptory challenges to exclude blacks from the petit jury.

## CONCLUSION

This Court concludes that none of petitioner Cornett Kyles' claims constitutes a constitutional defect in the proceedings through which his conviction was rendered. Accordingly, the respondents' motion for summary judgment is granted, and Kyles' cross-motion is denied. It is so ordered.