**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Ella Louise FORBES and Lillie Mae
Berry, Defendants-Appellants.**

No. 86–3530.

United States Court of Appeals,
Fifth Circuit.

April 29, 1987.

Donald R. Johnson, Baton Rouge, La., (court-appointed), for Ella Louise Forbes.

Richard M. Upton, Baton Rouge, La. (court-appointed), for Berry.

Ian F. Hipwell, Asst. U.S. Atty., Stanford O. Bardwell, U.S. Atty., Baton Rouge, La., for plaintiff-appellee.

Before GARZA, WILLIAMS, and GARWOOD, Circuit Judges.

GARWOOD, Circuit Judge:

The jury convicted defendants-appellants Lillie Mae Berry and Ella Louise Forbes of acting together to intercept a government benefits check addressed to Forbes' brother, Jackie Harrell, and to forge an endorsement on the check in an attempt to cash it. 18 U.S.C. §§ 2, 371, 495 & 1702. Both appellants argue that the prosecutor's peremptory challenges to three black venirepersons violated their equal protection and Sixth Amendment rights; Forbes also asserts that there was insufficient evidence that she lacked authority to cash the check.

### Facts and Proceedings Below

The facts are not complicated. Like his sister, Ella Louise Forbes, Jackie Harrell

lived in Baton Rouge. At the time of the events at issue, April 1986, Harrell had a disability and consequently had been receiving Supplemental Security Income (SSI) checks from the Social Security Administration. However, Harrell had been in the East Baton Rouge Parish Prison since February 1986, and he had instructed his wife to cash his SSI checks for him while he was in prison.[1] The April 1986 SSI check was made payable to Harrell and sent to a Baton Rouge address where he had previously lived. The record does not reveal how, but the check fell into the possession of Forbes, rather than Harrell's wife, who had moved to a different address.

On April 10, 1986, Forbes and her friend, Lillie Mae Berry, took the check to "Cashier's of Louisiana," a check-cashing establishment. There Berry signed the back of the check "Jackie Harrell" and attempted to cash it. She claimed to be Jackie Harrell, but had no identification. The teller filled out a "check identification card" based on information provided by Berry, posing as Harrell. Upon investigation, it was discovered that this information was not wholly accurate—for example, the social security number provided by Berry was two digits different than the number printed on the check. Suspecting that the check had been stolen, the teller surreptitiously telephoned the United States Secret Service. When a Secret Service agent ar-

rived at Cashier's, he questioned Berry and Forbes and then arrested them.

The grand jury indicted Forbes and Berry together on three counts. The first count charged them with conspiracy to violate 18 U.S.C. § 1702[2] and § 495.[3] Count two charged Berry with violating section 1702, and charged Forbes with aiding and abetting that offense, 18 U.S.C. § 2. Count three charged Berry with violating section 495, and charged Forbes with aiding and abetting that offense.

After a one-day trial, the jury found Forbes and Berry guilty on all three counts. They were sentenced to concurrent one-year terms on each count, and as to each defendant a special assessment of $50 was levied on each count.

### Discussion

The principal question on appeal is whether the prosecution violated the equal protection rights of these black defendants by using its peremptory challenges to strike three black venirepersons.

### I. Peremptory Challenges

There were thirty-one persons on the venire; five of them were black. The prosecutor used three of his six peremptory challenges to strike black venirepersons. He used two more challenges on white venirepersons and left one challenge unused.

---

1. Harrell's imprisonment destroyed his eligibility for SSI benefits. 42 U.S.C. § 1382(e)(1)(A); 20 C.F.R. § 416.211 (1986). The Social Security Administration continued to mail SSI checks to Harrell because it was unaware of his incarceration.

2. 18 U.S.C. § 1702 provides:
   "**Obstruction of correspondence**
   "Whoever takes any letter, postal card, or package out of any post office or any authorized depository for mail matter, or from any letter or mail carrier, or which has been in any post office or authorized depository, or in the custody of any letter or mail carrier, before it has been delivered to the person to whom it was directed, with design to obstruct the correspondence, or to pry into the business or secrets of another, or opens, secretes, embezzles, or destroys the same, shall be fined not more than $2,000 or imprisoned not more than five years, or both."

3. 18 U.S.C. § 495 provides:

"**Contracts, deeds, and powers of attorney**
"Whoever falsely makes, alters, forges, or counterfeits any deed, power of attorney, order, certificate, receipt, contract, or other writing, for the purpose of obtaining or receiving, or of enabling any other person, either directly or indirectly, to obtain or receive from the United States or any officers or agents thereof, any sum of money; or
"Whoever utters or publishes as true any such false, forged, altered, or counterfeited writing, with intent to defraud the United States knowing the same to be false, altered, forged, or counterfeited; or
"Whoever transmits to, or presents at any office or officer of the United States, any such writing in support of, or in relation to, any account or claim, with intent to defraud the United States, knowing the same to be false, altered, forged, or counterfeited—
"Shall be fined not more than $1,000 or imprisoned not more than ten years, or both."

The resulting jury was composed of ten whites and two blacks. The ratio of black persons to white persons on the jury was virtually identical to that on the venire—one in six.

Just before the unchosen venire members were dismissed, counsel for Forbes objected to the prosecutor's use of his peremptory challenges:[4] "The basis of the motion that I'm making ... is that the U.S. Attorney has used the majority of his peremptory challenges to excuse black jurors...." Counsel interpreted *Batson v. Kentucky*, — U.S. —, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), then just over two months old, to require the prosecutor to offer a racially neutral explanation any time he peremptorily struck a black venireperson. The district court responded, "I don't know that the law is quite as severe as you have stated it to be, but I think it would be well for [the prosecutor] to put on the record his reasons for making these challenges...."

The prosecutor explained why he had struck two of the black venirepersons. The first of these had two sons in legal trouble; apparently one son had written some hot checks. The prosecutor struck the second black because she sat with her arms crossed during voir dire and impressed him as being hostile to serving on the jury. The prosecutor suspected that

she might manifest this hostility by retaliating against the government's case simply because the government had called her for jury duty. Having explained two strikes, the prosecutor stopped because, as he told the court, he did not interpret the motion of Forbes' counsel to require him to explain further since the majority of the three unexplained challenges had been exercised against whites. The judge asked Forbes' and Berry's counsel for a response to the prosecutor's interpretation of their motion, and they never objected to the prosecutor's failure to explain his strike of the third black venireperson. Defense counsel only requested the addition of the second or "hostile" black venireperson to the jury, and when the court denied that request, counsel sought no further relief or explanation and in effect acquiesced in the other four prosecution strikes.[5] The question is whether these facts show a violation of defendants' equal protection rights.

*Batson*, the authoritative case on the equal protection question,[6] overturned part of *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), by holding that generally the prosecution may not use its peremptory challenges to strike venirepersons of the defendant's race solely on the assumption that they would be biased toward defendant merely because he is of

---

4. Counsel for Berry shortly joined the objection by Forbes' counsel, and Forbes' counsel continued to speak for both defendants.

5. In a subsequent minute entry, the district court elucidated the reasons he had denied the motion:

"The prosecution exercised only five of its six peremptory challenges, striking three black jurors and two white jurors. There were two black remaining on the jury after all challenges had been used. From just these facts, it is obvious that the prosecutor did not exercise his peremptory challenges in a racially discriminatory manner, since if such were his intent, he could have eliminated all black jurors. Thus defendants have failed to establish a prima facie case of purposeful discrimination, and the matter could rest at this point. *Batson, supra,* [106 S.Ct.], at 1723.

"However, in order to provide the defendants with the benefit of any possible doubt, the prosecutor provided a neutral explanation for the use of his challenges to certain black

jurors. With respect to one of these jurors, the explanation is such that a challenge for cause might have been justified, and with respect to another, the challenge was exercised on the basis of racially-neutral factors. Thus, whatever inferences might have been raised by the prosecutor's use of his peremptory challenges in this case, these have been effectively rebutted by the prosecutor's explanations."

6. In *Batson*, a state prosecution, the Supreme Court construed the Fourteenth Amendment's equal protection clause, which does not itself apply to *federal* prosecutions. Nonetheless, the analysis in *Batson* governs this case because the Fifth Amendment, which does constrain the federal government, has been interpreted to require generally the same equal protection analysis as the Fourteenth Amendment. *See United States v. Leslie,* 813 F.2d 658 (5th Cir.1987) (en banc) (remanding case on appeal from a federal conviction and directing consideration in light of *Batson* ).

the same race. 106 S.Ct. at 1723. *Batson* granted defendants the right to put the prosecution to an explanation of its peremptory challenges if defendants establish a *prima facie* case of discrimination.

A *prima facie* case consists of three somewhat imprecise elements. *First,* defendant "must show that he is a member of a cognizable racial group ... and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race." *Id.* *Second,* defendant can rely on the fact that peremptory challenges may disguise racial discrimination. *Id.* *Third,* "the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race." *Id.; see also Smith v. McCotter,* 798 F.2d 129, 132 (5th Cir. 1986) (describing the elements of a *Batson prima facie* case); *United States v. Erwin,* 793 F.2d 656, 667 (5th Cir.1986) (same), *cert. denied,* — U.S. —, 107 S.Ct. 589, 93 L.Ed.2d 590 (1986). The Supreme Court vested the district courts with leeway to determine whether a defendant has established a *prima facie* case. 106 S.Ct. at 1723.

■ In general, we would hesitate to infer a finding of a *prima facie* case from the mere fact that the district court has required an explanation from the prosecutor. Indeed, in this case the district court's minute entry states that defendants had not established a *prima facie* case, though the court also required an explanation. However, appellate review should not become bogged down on the question of whether the defendant made a *prima facie* showing in cases where the district court has required an explanation. Taking our cue from *Batson*'s repeated analogies to Title VII jurisprudence, 106 S.Ct. 1721 n. 18, 1722 n. 19, 1724 n. 21, we hold that when the prosecution's explanation is of record, we will review only the district court's finding of discrimination *vel non.* *Cf., e.g., U.S. Postal Service Bd. of Gov. v. Aikens,* 460 U.S. 711, 103 S.Ct. 1478, 1481–82, 75 L.Ed.2d 403 (1983); *Merrill v.*

*Southern Methodist University,* 806 F.2d 600, 605 n. 6 (5th Cir.1986) (noting in Title VII context that " 'by the time a full-tried case reaches us on appeal, the parties' showing at the preliminary levels of the framework is irrelevant.... We need address only the propriety of the ultimate finding of discrimination *vel non.*' " (quoting *EEOC v. Exxon Shipping Co.,* 745 F.2d 967, 972 (5th Cir.1984)).

In another of its analogies to Title VII jurisprudence, the *Batson* Court cited with approval *Anderson v. Bessemer City,* 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 318 (1985). That Title VII case reiterated that Rule 52(a) governs review of the finding of discrimination *vel non* and stated, "When findings are based on determinations regarding the credibility of witnesses, Rule 52 demands even greater deference to the trial court's findings...." 105 S.Ct. at 1512. The *Batson* Court seems specifically to have focused on this latter proposition when it held, "Since the trial judge's findings in the context under consideration here largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference." *Batson,* 106 S.Ct. at 1724 n. 21.

■ Under either a "clearly erroneous" or "great deference" standard, there is no basis for upsetting the district court's findings. The appellants admit that the prosecutor supplied an objective explanation for striking the black woman whose two sons had been in trouble with the law. The district court sagely observed that "a challenge for cause might have been justified" as to this juror; this was more than sufficient under *Batson,* which emphasized that "the prosecutor's explanation need not rise to the level justifying exercise of a challenge for cause." 106 S.Ct. at 1723.

The prosecutor's reasons for striking the second black venireperson were less quantifiable, but not for that reason necessarily fatally suspect. He sensed by her posture and demeanor that she was hostile to being in court and feared that she might respond negatively to the prosecution simply because the government was responsible for calling her to jury duty. After hearing this

explanation, the district court, who had just presided over the voire dire, concluded that "the challenge was exercised on the basis of racially-neutral factors." The record does not remotely suggest that the prosecutor's intuitive assumption was based on race.

■■■ Appellants also protest the prosecutor's failure to explain the third of his strikes against blacks. The district court did not require the prosecutor to explain this strike, and if defendants had raised below any question respecting this particular strike or the prosecutor's continued silence, we would have to decide whether defendants had established a *prima facie* case so as to require an explanation of the third strike, in addition to the first two.[7] The prosecutor stated his opinion that by explaining two strikes he had satisfied defendants' motion. When the district court asked defense counsel to respond, counsel never mentioned the third strike, and instead spoke only to the prosecutor's justification for striking the venireperson who had seemed hostile and requested only that that venireperson be allowed to remain on the panel. The prosecutor may have misin-

terpreted the defense motion and thus stopped one strike short of a full explanation, but the court, who had ordered the explanation, and the defendants, who had asked for it, were then satisfied with its *scope* (though the defense was not satisfied with its content respecting the "hostile" venireperson). Now it is too late for appellants to insist on an explanation they did not request at trial. *Cf. Batson*, 106 S.Ct. at 1724–25 (referring to defendant's "timely objection" to prosecutor's strike); *Erwin*, 793 F.2d at 667 ("The Court in *Batson* envisioned that a motion to strike would be made promptly, probably before the venire was dismissed."). The "timely objection" rule is designed to prevent defendants from "sandbagging" the prosecution by waiting until trial has concluded unsatisfactorily before insisting on an explanation for jury strikes that by then the prosecutor may largely have forgotten. Furthermore, prosecutorial misconduct is easily remedied prior to commencement of trial simply by seating the wrongfully struck venireperson. After trial, the only remedy is setting aside the conviction. *Batson*, 106 S.Ct. at 1725. This is an equally important justification for the "timely objection" rule.[8]

7. The Eleventh Circuit has observed, correctly we think, "Failure by a prosecutor to explain every peremptory strike of black jurors is not necessarily fatal to the prosecutor's ability to rebut a prima facie case; likewise, explanation of most of the strikes on nonracial grounds does not necessarily" satisfy his burden. *United States v. David*, 803 F.2d 1567, 1571 (11th Cir. 1986).

In this case, the prosecutor's third strike, though unexplained, seems unlikely to have been the result of intentional discrimination. The confluence of the following facts leads to this conclusion: (1) the black/white ratio on the jury mirrored that of the venire; (2) the prosecutor adequately explained two strikes; (3) the prosecutor did not use all his strikes; (4) there were two blacks left on the jury. Although the existence of fewer than all or most of these circumstances might be insufficient to prevent or rebut an inference of intentional discrimination, *see Fleming v. Kemp*, 794 F.2d 1478, 1483 (11th Cir.1986) ("[N]othing in *Batson* compels the district court's conclusion that constitutional guarantees are never abridged if all black jurors but one or two are struck because of their race."), the Court is mindful of Justice Holmes' comment in a different context that "we cannot let the fagot be destroyed by taking up each item ... separately and breaking the

stick." *Edwards v. Chile Copper Co.*, 270 U.S. 452, 46 S.Ct. 345, 346, 70 L.Ed. 658 (1926). There is significance, perhaps determinative significance, in the coexistence of these facts.

8. In addition to their equal protection claim, appellants assert that the chosen jury violated an asserted Sixth Amendment right to a jury representing a cross-section of the community. At some length, this identical Sixth Amendment argument was rejected in *United States v. Leslie*, 783 F.2d 541, 549–61 (5th Cir.1986) (en banc). *Leslie*, decided two months before *Batson*, also held that the equal protection clause did not prohibit peremptory challenges on the basis of race strictly for purposes of advancing the prosecutor's chances of winning the case being tried. *Leslie* likewise rejected employment of appellate supervisory powers to prohibit such use of peremptories. The Supreme Court granted certiorari, vacated our *judgment* in *Leslie*, and remanded for further consideration in light of *Griffith v. Kentucky*, — U.S. —, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987), which held that *Batson* applied to all cases on direct review at the time it was announced. *Leslie v. United States*, — U.S. —, 107 S.Ct. 1267, 94 L.Ed.2d 128 (1987). We in turn remanded *Leslie* to the district court for a hearing at which the prosecution could, within the equal protection framework of *Bat-*

## II. Sufficiency of the Evidence

Forbes argues that the prosecution failed to adduce sufficient evidence of her lack of authority to cash the check and thus her conviction under 18 U.S.C. § 495 for forgery must be reversed.[9] Her argument is not persuasive. She acknowledges the evidence that her brother, Jackie Harrell, had not authorized her to cash his check, but asserts that because he was not supposed to be receiving the checks anyway, he could not have legally authorized her to cash the checks even if he had so desired. Therefore, she argues, the prosecution proved only the absence of authorization from one who had no right to grant it. However, if anyone had power to authorize what occurred, it was Harrell, for the check was addressed and payable to him. Harrell testified that he had autho-

---

*son,* explain its peremptory challenges of the black venirepersons. *United States v. Leslie,* 813 F.2d 658 (5th Cir.1987) (en banc).

In *Batson,* the Court "express[ed] no view on the merits of any of petitioner's Sixth Amendment arguments," 106 S.Ct. at 1716 n. 4, holding instead that "resolution of petitioner's claim properly turns on application of equal protection principles...." *Id.* Similarly, in remanding *Leslie* to the district court, we held that "*Batson* governs the present issue of the complained of prosecution peremptory challenges of jurors of defendant's race." 813 F.2d at 659. Thus *Batson* and *Leslie* direct that objections to prosecution use of peremptory challenges against jurors of defendant's race are to be treated under an equal protection analysis, and indeed we believe the Sixth Amendment offers no greater protection in this context. *See Lindsey v. Smith,* 820 F.2d 1137 (11th Cir.1987) (stating that any differences between the equal protection clause and the Sixth Amendment are "of no consequence" when a black appellant, who complained of peremptory strikes against black jurors, relies on the same facts for both his equal protection and Sixth Amendment claims, and the prosecution would rely on the same facts to defend each claim). *See also Leslie,* 783 F.2d at 551–52 n. 17.

In stating this, we have assumed, *arguendo* only, that the Sixth Amendment's cross-section analysis applies to the petit jury. *But see Leslie,* 783 F.2d at 552–56; *Lockhart v. McCree,* ─── U.S. ───, 106 S.Ct. 1758, 1765, 90 L.Ed.2d 137 (1986) ("We remain convinced that an extension of the fair cross-section requirement to petit juries would be unworkable and unsound, and we decline [the] invitation to adopt such an extension."); *Welcome v. Blackburn,* 793 F.2d 672, 675 (5th Cir.1986) (noting that *Lockhart* "refused to apply the Sixth Amendment's fair cross-section requirement" to petit juries), *cert. filed,* ─── U.S. ───, 107 S.Ct. 37, 92 L.Ed.2d 789 (1986); *United States v. Salamone,* 800 F.2d 1216 (3d Cir.1986) (noting that in *Lockhart* the Supreme Court "reiterated its reluctance to bring petit juries within the ambit of the fair cross-section analysis"); *United States ex rel. Miller v. O'Leary,* 651 F.Supp. 174, 179 (N.D.Ill. 1986) (stating that even if the Supreme Court has not actually rejected a Sixth Amendment claim based on peremptory strikes of black jurors, "the Court's language in *Lockhart* leaves little doubt about its view of the matter"); *United States ex rel. Kyles v. O'Leary,* 642 F.Supp. 222, 230 (N.D.Ill.1986) (stating that *Lockhart* "seems to foreclose" the Sixth Amendment question not addressed in *Batson* ); *contra Booker v. Jabe,* 801 F.2d 871 (6th Cir.1986) (on remand from Supreme Court vacation of prior opinion, 775 F.2d 762 (6th Cir.1985), finding Sixth Amendment protection against peremptory challenges based on race, court holds that *Batson* and *Allen v. Hardy,* ─── U.S. ───, 106 S.Ct. 2878, 92 L.Ed.2d 199 (1986), "do not affect our [prior] *disposition* ") (emphasis added), *cert. denied,* ─── U.S. ───, 107 S.Ct. 910, 93 L.Ed.2d 860 (1987); *United States ex rel. Yates v. Hardiman,* 656 F.Supp. 1006 (N.D.Ill.1987) (interpreting *Lockhart* as not precluding Sixth Amendment bar of peremptory strikes against black venirepersons and granting writ of habeas corpus on Sixth Amendment grounds). *See also Lindsey,* 820 F.2d at 1145 (refusing to extend fair cross-section requirement to petit juries, but stating that *Lockhart* "did not foreclose the possibility that the sixth amendment offers some protection against the exclusion of blacks from petit juries by use of peremptory challenges"). Where the Sixth Amendment applies, it may offer solace to groups in addition to those protected by an equal protection analysis. We simply hold that in the present context, the Sixth Amendment offers no greater protection than that afforded by the equal protection analysis. Finally, as far as any cross-section analysis is concerned, it is worth repeating that in this case the ratio of blacks to whites on the jury was the same as the ratio on the venire, and appellants have not attacked the composition of the venire even though the Sixth Amendment clearly applies to venires. *See Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979); *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 701–02, 42 L.Ed.2d 690 (1975).

**9.** In a prosecution under 18 U.S.C. § 495, the government has the burden of proving that defendant lacked authority to sign for another, at least where defendant claims to have been authorized. *Conley v. United States,* 257 F.2d 141, 143 (6th Cir.1958); *see United States v. Evans,* 436 F.2d 1305, 1307–08 (5th Cir.1971). Forbes did not testify, but she called her mother, who claimed that Harrell had authorized both herself and Forbes to cash his SSI checks.

rized his wife to cash his checks and that he had not authorized Forbes; there was contrary testimony from his mother, *see* note 9, *supra,* but the jury obviously credited Harrell. Viewed in the light most favorable to the government, the evidence is sufficient to support the jury verdict. *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

### Conclusion

The district court did not clearly err in finding that the prosecutor's use of his peremptory challenges was not animated by racial discrimination. Therefore, neither appellants' Fifth Amendment, nor any claimed Sixth Amendment, rights were violated. There was also sufficient evidence that Forbes lacked authority to cash her brother's check.

AFFIRMED.

JERRE S. WILLIAMS, Circuit Judge, specially concurring:

My brother Garwood's opinion is completely sound in its reasoning and conclusions with respect to the constitutional issues in this case. I concur fully with the result and with all of the reasoning as to those issues.

The purpose of this special concurrence is to raise a caveat about the implications of footnote 8 of the panel opinion. It is my view that the procedural protections of defendants charged with crimes against the United States are broader than the protections in the United States Constitution available to defendants charged with crimes against the states. *Batson v. Kentucky,* — U.S. —, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), is a state case and does not hold to the contrary.

The source of the broader protections against persons charged with federal offenses lies in the well established supervisory power of the federal courts, trial and appellate, to insure that those accused of federal crimes have fair trials. I do not go into detail concerning the nature and scope of this power in this concurrence because it is set out fully in my dissenting opinion in *United States v. Leslie,* 783 F.2d 541, 566

\* See 819 F.2d 546.

(5th Cir.1986) (en banc). The federal supervisory power authorizes federal district courts to demand a higher level of fairness in the procedures under which we undertake to convict those charged with federal crimes than the procedures required by the statutes or the due process of law and equal protection of the law provisions of the Constitution. The federal appellate courts are empowered to reverse federal convictions if they find a failure of fundamental fairness, although the failure falls short of constitutional or statutory requirements. I cannot countenance any implication that such a power does not exist and more particularly that it does not exist in federal criminal cases where charges of racial or other similar discrimination are made.

I concur in the result in this case without reservation because there is not the slightest showing of the kind of unfairness by the federal prosecutor in this case which could call forth the application of this established supervisory power.