527 So.2d 764 (1987)
Jewell Douglas WILLIAMS
v.
STATE.
1 Div. 332.
Court of Criminal Appeals of Alabama.
October 13, 1987.
Rehearing Denied November 10, 1987.
Certiorari Quashed July 8, 1988.
*766 David A. Simon, E.E. Ball and Richard M. Kemmer, Jr., of Owen, Ball & Simon, Bay Minette, for appellant.
Charles A. Graddick, Atty. Gen., and Marsha Gail Ingram, Asst. Atty. Gen., for appellee.
Alabama Supreme Court 87-248.
PATTERSON, Judge.
Appellant, Jewell Douglas Williams, was indicted and convicted, after a jury trial, for the capital offense of murder committed during a robbery in the first degree or an attempt thereof, in violation of § 13A-5-40(a)(2), Code of Alabama 1975. Sentencing hearings were conducted in accordance with §§ 13A-5-45 and -47. The jury returned an advisory verdict recommending a sentence of life imprisonment without parole and, thereafter, the trial court sentenced appellant to life imprisonment without parole. Williams appeals, raising three issues. He does not question the sufficiency of the evidence to support his conviction.
The prosecution's evidence disclosed that, on February 17, 1984, the body of Otis Ware, an elderly man, was discovered in his home about 8:45 p.m. He had been beaten to death with a blunt instrument in a utility room in the rear of his home. Blood was splattered on the walls and floor of the room. A bloody hammer belonging to the victim was found in a garden behind the house. The victim was known to carry large sums of money and had apparently been robbed. One trouser leg had been ripped, and his pants pockets were turned "inside out." No money was found on the body. He was observed to have had in his possession, earlier on the day of his murder, several $100 bills and some $20 bills. A spot of blood with the tread or track of a tennis shoe in it was found on the threshold of the back door of the victim's house. Two spots of blood were found on the concrete slab outside the back door. In the garden or "collard patch" behind the victim's home, investigators discovered two footprints similar to the tennis shoe track found on the threshold of the back door. These footprints pointed in the direction of the residence of Bessie M. Williams (no relation to appellant), which is behind and adjacent to the victim's residence. Similar footprints were found around Mrs. Williams's residence. Tracking dogs were brought to the scene, and they picked up a "scent" at the victim's back door and trailed the scent across the garden to the door of the Williams residence. It was learned that appellant and his girlfriend, Virginia Stanfield, lived in the Williams residence, where they rented a bedroom. Appellant was known to the officers, having previously been convicted of burglary and having been investigated for unrelated criminal matters.
Around 1:40 a.m., February 18, 1984, the officers went to the Williams residence. When they knocked on the door, Virginia Stanfield opened it, and the officers told her that they would like to discuss, with her and appellant, the incident next door. After she invited the officers into the house, she was asked if appellant owned a pair of tennis shoes, and she said that he did. As they were talking with Ms. Stanfield, in the front of the house, appellant came into the room. He was in his underwear. Appellant was told by one of the officers to go back to his bedroom and they would talk with him in a moment. After talking with Ms. Stanfield, the officers told *767 appellant that they would like to talk with him, and he invited them into his bedroom. He was dressed in a robe and underwear. They told him that Mr. Ware had been beaten to death and probably robbed and that they wanted to talk with him about it. He was then given warnings in accordance with Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). He stated that he understood his rights and that he had nothing to hide. He was cooperative with the officers. He told them that he had been in Pensacola the day before and had returned home about 10:55 p.m. While talking with appellant, one of the officers observed a pair of trousers and a shirt in a chifforobe in the bedroom, and it appeared that there was a bulge in one of the pockets of the trousers. The items were in plain view of the officer. Appellant was asked what he had been wearing that day, and he pointed to the trousers in the chifforobe. The officer picked up the trousers and the shirt. The officer noticed red spots on the trousers and shirt and asked appellant about them. Appellant explained that the spots on the trousers were paint and those on the shirt were blood where he had mashed a "pimple." The officer discovered, in the trousers, a wallet containing approximately $185. The money was counted, and the wallet and money were returned to appellant. The money partly consisted of one $100 bill and several $20 bills. The officers then asked appellant to remove his robe and stand up. He did so, and they examined him for scratches or bruises. Appellant was asked if he owned a pair of tennis shoes, and he stated that he did not. He showed the officers a pair of new boots and told them that he had been wearing the boots that day. The officers asked appellant if they could take the trousers and shirt with them for testing, and he agreed, stating, "I ain't got nothing to hide. Yes, sir. No problem." At this point, one of the officers started looking through the remaining clothes in the room, and appellant stated that if they went any further they would have to have a search warrant. The officers immediately ceased looking and left.
Ms. Stanfield testified that, shortly after the officers left the Williams residence, she asked appellant if he had killed Mr. Ware and that he answered, "Yes". Ms. Stanfield and appellant decided to flee to Florida. Without taking any baggage, they left before daylight.
Upon further investigation, the officers learned that appellant owned a pair of tennis shoes and had been wearing them on the date of the victim's death. So on February 24, 1984, the officers returned to the Williams residence. Mrs. Williams consented to a search of her residence, with the exception of the bedroom which had been occupied by appellant and Ms. Stanfield. During the search, a pair of tennis shoes was discovered in a hall closet. The shoes, similar to the ones owned by appellant, had what appeared to be "moist" blood stains on them. The lease arrangements between Mrs. Williams and appellant did not include the use of the hall closet where the shoes were found. The officers also discovered what appeared to be blood stains on appellant's bedroom door. The door was removed from its hinges and taken away for testing. The tests conducted on the door revealed that the stains were not blood.
A warrant was issued for appellant's arrest, and he was subsequently arrested in Tampa, Florida, and returned to Alabama. One James Garner, a trusty in the Baldwin County jail, testified that while appellant was in jail awaiting trial, he asked him, "Why did you kill that damned old man?" Appellant answered that "he just hit him."
Tests revealed that appellant had "O" type blood and the victim "B" type. Tests confirmed that the spots on the pants, shirt, and shoes were blood of the "B" type. The tennis shoes, similar to those seen in appellant's possession, had a tread that was similar to the tread on the shoes which made the tracks at the scene of the crime and around the Williams residence.
Appellant did not testify during the guilt phase of the trial, nor did he offer any evidence in his defense.

I
Appellant first contends that he was illegally arrested when the police entered *768 the Williams residence on the night of the murder and that all evidence obtained on that occasion was tainted by the illegal arrest and should have been suppressed. In the alternative, he argues that if there were no arrest, he did not voluntarily consent to a search and interrogation by the officers and that the evidence obtained, as a result of such, should have been suppressed.
Prior to trial, appellant moved to suppress all evidence seized during the searches of February 18, 1984, and February 24, 1984. He alleged that each search was conducted without a warrant, the presence of exigent circumstances and probable cause, or consent, and under coercive circumstances. The evidence which he contended should have been suppressed is, as follows: One blood-stained shirt, one pair of blood-stained trousers, one pair of blood-stained tennis shoes, and testimony of any officer concerning the $185 which was found in the wallet in appellant's trousers.
Appellant's testimony at the suppression hearing conflicted with that of the officers in some major respects. In contrast with the officers' testimony, he claimed that he did not invite the officers into his room, that he asked if they had a search warrant when they initially entered his room, that he was not given Miranda warnings, that he did not consent for the officers to take his shirt and trousers, and that he did not feel that he was free to leave but, on the contrary, felt that he was under arrest.
Appellant concedes, in his brief, that he was not arrested in the "traditional sense" on the night of February 18, 1984. He also concedes that the officers involved did not believe that they had arrested appellant on that occasion. He bases his contention solely on the fact that the officers told him to wait in his room until they finished talking with his girlfriend and they would then talk with him. We do not consider this to have constituted an arrest. Since a murder had been committed next door, it was reasonable to expect that inquiries would be made of the occupants of the Williams residence. It is unlikely that appellant was overwhelmed by the presence of the officers; he knew them and had had some experience with them in the past. His conduct and statements on the occasion do not suggest that he was overborne or intimidated.
Section 15-10-4, Code of Alabama 1975, prescribes the procedure for making warrantless arrests, as follows:
"When arresting a person without a warrant, the officer must inform of his authority and the cause of arrest, except when the person is arrested in the actual commission of a public offense or on pursuit...."
See Rutledge v. Rowland, 161 Ala. 114, 49 So. 461 (1909); Slaughter v. State, 47 Ala. App. 634, 259 So.2d 840, cert. denied, 288 Ala. 751, 259 So.2d 845 (1972); Davis v. State, 27 Ala.App. 490, 176 So. 226, cert. denied, 234 Ala. 626, 176 So. 227 (1937).
What constitutes an arrest? We find a useful discussion of this question in 2 W. LaFave, Search and Seizure § 5.1(a) (2d ed. 1987), which in pertinent part is as follows:
"It is often important to determine whether or not the police have made an arrest and, if they have, precisely when the arrest occurred. ... [I]t is sometimes the defendant who will claim that an arrest did occur, or that it occurred earlier than is conceded by the prosecution, for if it may be established that an arrest was made at a time when sufficient grounds for doing so were lacking, then the fruits of the arrest must be suppressed.
"Because ... an arrest is a Fourth Amendment seizure, any effort to define the term `arrest' must begin with an inquiry into what amounts to a seizure in the Fourth Amendment sense. For many years not even a workable formula was provided by the Supreme Court with respect to this issue. Then came United States v. Mendenhall, [446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980),] where Justice Stewart (announcing the judgment of the Court, but in a part of his opinion in which only Justice Rehnquist joined) asserted:

*769 "`We conclude that a person has been "seized" within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.... In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person.'
"Shortly thereafter, in Florida v. Royer, [460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983),] the Stewart standard was accepted by a majority of the Court.
"Two features of the Mendenhall-Royer definition of a Fourth Amendment seizure deserve emphasis here. For one thing, the question is not (contrary to considerable earlier authority) whether the officer intended to seize the person. And thus in Royer Justice Stewart concluded that `the subjective intention of the DEA agent ... to detain the respondent, had she attempted to leave, is irrelevant except insofar as that may have been conveyed to the respondent.' Secondly, the question is not how the particular suspect subjectively perceived the situation, for the test is stated in objective `reasonable man' terms." (Footnotes omitted.)
See Cox v. State, 489 So.2d 612 (Ala.Cr. App.1985); Worthy v. State, 473 So.2d 634 (Ala.Cr.App.1985); McCants v. State, 459 So.2d 992 (Ala.Cr.App.1984).
In applying the Mendenhall-Royer "reasonable man" standard to the case sub judice, and considering all the circumstances surrounding the incident, we conclude that a reasonable person could not have believed that he was not free to leave. By no reasonable view of all the evidence does it tend to prove an arrest of appellant, as he contends. We conclude that no arrest occurred and, thus, the evidence seized in the Williams residence was not the result or fruit of an illegal arrest. Accordingly, we find it unnecessary to address the issue of whether there was probable cause to arrest appellant.
Appellant next argues that, assuming arguendo that there was no arrest, the prosecution did not meet its burden of showing that the entries into the residence and the resulting seizures of evidence came within one of the well-recognized exceptions to the prohibition of warrantless searches and seizures.
There are six exceptions under which warrantless searches have been upheld: (1) plain view, (2) consent, if voluntarily and knowingly given, (3) incident to a lawful arrest, (4) hot pursuit or emergency situations, (5) exigent circumstances coincidental with probable cause, as in the case of moveables, and (6) stop and frisk situations. Langston v. State, 348 So.2d 273 (Ala.Cr.App.), cert. denied, 348 So.2d 277 (Ala.1977); Cook v. State, 56 Ala.App. 250, 320 So.2d 764 (1975); Daniels v. State, 290 Ala. 316, 276 So.2d 441 (1973). The state contends that the entries and resulting seizures came within the hot pursuit or emergency situation, exigent circumstances coincidental with probable cause, and consent exceptions.
The record shows that appellant's girlfriend, Ms. Stanfield, with whom he shared the rented bedroom and common areas of the house, gave permission to the officers to enter the residence. She was authorized to do so, since she had common authority with appellant over the premises. The consent of one who possesses common authority over premises or effects is valid as against the absent, non-consenting person with whom that authority is shared. United States v. Matlock, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). According to the officers, appellant consented to their entry into his bedroom. Appellant denies that he gave such consent. The *770 resolution of the conflicts in the testimony, as well as the voluntariness of the consent, are questions for the trial court, which are to be determined from the testimony and the totality of the circumstances. The trial court's finding will not be disturbed on appeal unless the appellate court is convinced that the conclusion is palpably contrary to the weight of the evidence. Coots v. State, 434 So.2d 864 (Ala.Cr.App.1983). We find that there was sufficient evidence to justify the trial court in concluding that appellant freely and voluntarily consented to the entry of the officers into his bedroom. The officers' failure to advise appellant of his right to refuse to consent does not undermine the voluntariness of his consent, for he had no right to be so advised. Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).
While the record shows that Ms. Stanfield consented to the officers' entry into the residence and appellant consented to their entry into his bedroom, we cannot find any indication in the record that they consented to a search of the house or bedroom. Consent to search must be proved by clear and positive testimony and must be unequivocal, specific, and intelligently given, uncontaminated by any duress and coercion. United States v. Williams, 754 F.2d 672 (6th Cir.1985); King v. State, [Ms. 1 Div. 272, August 18, 1987] 527 So.2d 759 (Ala.Cr.App.1987). We do not decide this issue on the grounds urged by the state, but elect to dispose of the issue on the right of the officers to seize the items in appellant's room under the plain view exception.
The plain view doctrine authorizes the warrantless seizure of personal property where the initial intrusion which affords the officers a plain view is lawful, the discovery of the property is inadvertent, and the incriminating nature of the property is "immediately apparent." Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) (plurality opinion). Although this doctrine was adopted by only a plurality of the Coolidge Court, it has since been recognized by a majority of the United States Supreme Court. See United States v. Hensley, 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985); Texas v. Brown, 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983) (wherein, although this was also a plurality opinion, the Justices differed only in the application of the doctrine, rather than its validity); State v. Calhoun, 502 So.2d 808 (Ala.1986). The phrase "immediately apparent" does not "imply that an unduly high degree of certainty as to the incriminatory character of evidence is necessary for an application of the `plain view' doctrine." Texas v. Brown, 460 U.S. at 741, 103 S.Ct. at 1543. It does not mean that an officer must "be possessed of near certainty as to the seizable nature of the items." Id. Rather, the character of the property must be such as to give the officer probable cause to associate the property with criminal activity. Texas v. Brown; Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); United States v. Minor, 756 F.2d 731 (9th Cir.), vacated on other grounds, 474 U.S. 991, 106 S.Ct. 401, 88 L.Ed.2d 353 (1985), on remand, 783 F.2d 154 (9th Cir. 1986); Moya v. United States, 761 F.2d 322 (7th Cir.1984); State v. Calhoun; Shipman v. State, 291 Ala. 484, 282 So.2d 700 (1973); McElroy v. State, 469 So.2d 1337 (Ala.Cr.App.1985); Thomas v. State, 453 So.2d 1075 (Ala.Cr.App.1984). "[T]he plain view exception would be worthless if officers had to be `absolutely certain' that what they saw was seizable." 2 W. LaFave, supra, at § 6.7(a). As observed in Texas v. Brown, 460 U.S. at 742, 103 S.Ct. at 1543:
"As the Court frequently has remarked, probable cause is a flexible, common-sense standard. It merely requires that the facts available to the officer would `warrant a man of reasonable caution in the belief,' Carroll v. United States, 267 U.S. 132, 162 [45 S.Ct. 280, 288, 69 L.Ed. 543] (1925), that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false. A `practical, nontechnical' probability that incriminating evidence is involved is all that is required. *771 Brinegar v. United States, 338 U.S. 160, 176 [69 S.Ct. 1302, 1311, 93 L.Ed. 1879] (1949). Moreover, our observation in United States v. Cortez, 449 U.S. 411, 418 [101 S.Ct. 690, 695, 66 L.Ed.2d 621] (1981), regarding `particularized suspicion,' is equally applicable to the probable-cause requirement:
"`The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as factfinders are permitted to do the sameand so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.'"
Often some object, typically clothing, will be seized because of its potential value in identifying the suspect as the person who committed the crime for which he was lawfully arrested. King v. State. This seizure is permissible when it is probable that the defendant wore the clothing at the time of the crime and that it contains some substance, such as blood, semen, or mud, which will aid in establishing a fact. See, e.g., United States v. Sheard, 473 F.2d 139 (D.C.Cir.1972), cert. denied, 412 U.S. 943, 93 S.Ct. 2784, 37 L.Ed.2d 404 (1973) (wherein the court held that, during the arrest of defendant for recent bloody murder and where defendant was dressed in fresh clothing at the time of his arrest it was proper for officers to seize pants atop clothes hamper); People v. Holt, 18 Ill.App. 3d 10, 309 N.E.2d 376 (1974) (wherein the court held that, during arrest of defendant for recent armed robbery where assailant was known to have fallen in mud in making escape and where defendant was dressed only in underwear when he was arrested, it was proper to seize pants on bed). See also State v. Holloman, 197 Neb. 139, 248 N.W. 2d 15 (1976); State v. Bruzzese, 94 N.J. 210, 463 A.2d 320 (1983), cert. denied, 465 U.S. 1030, 104 S.Ct. 1295, 79 L.Ed.2d 695 (1984).
We find, in the instant case, that the bloody shirt and trousers were in plain view from a position where the officers had a right to be and that the discovery of this clothing was inadvertent. Having so found, we must now determine whether the officers had probable cause to reasonably believe that the items were associated with criminal activity. The reasonableness of the officer's act must be gauged at the time when he first viewed the items. The record shows that, at this point, the seizure was motivated by the officers' knowledge that a bloody murder had occurred nearby, a short time before, and that the evidence gathered thus far tended to show that the murderer had traveled from the scene to the house occupied by appellant. It was reasonable for the officers to assume that the person who committed the crime would have the victim's blood on his clothing. When the officers encountered appellant, he was in his underwear and robe. The type of crime involved rendered the shirt and trousers, which were piled in the open chifforobe and which were admittedly worn by appellant on the evening of the murder, potentially critical evidence. Thus, under these circumstances, the officers possessed probable cause to believe that the trousers and shirt constituted evidence of the crime for which appellant was ultimately charged and convicted.
In seizing the shirt and trousers in plain view, one of the officers, in the presence of the other officers and appellant, examined the contents of the pockets of the trousers and found the wallet, which contained $185. The discovery of the wallet and money did not result from an unreasonable search and seizure, and testimony concerning them was not subject to suppression, for we hold that the wallet and money were discovered in the course of making an inventory of the contents of the clothing. This inventory was for the protection of the officers, as well as appellant. See Chavis v. Wainwright, 488 F.2d 1077 (5th Cir.1973) (wherein the court ruled that where the police seized bloody clothing as evidence of a crime from the defendant *772 who had been seriously injured from a stab wound and taken to the hospital, heroin found in an inventory of the clothing was admissible). See also Floyd v. State, 24 Md.App. 363, 330 A.2d 677 (1975).
In reference to the search of portions of the Williams residence on February 24, 1984, and the seizure of the bloody tennis shoes in the hall closet, the record shows that Mrs. Williams consented to the search. Mrs. Williams's consent to search explicitly extended to her entire residence, with the exception of appellant's and Ms. Stanfield's bedroom. Moreover, appellant had no standing to contest this particular search and seizure. Ramires v. State, 492 So.2d 615 (Ala.Cr.App.1985). The tennis shoes were found in a hall closet, an area which appellant was not authorized to use and which was within the exclusive control of Mrs. Williams. The search and the seizure were valid.

II
Appellant next contends that reversible error occurred when the trial court overruled his objection to the testimony of the investigating officers that, when one of the officers commenced "looking around" after the seizure of the pants and shirt, appellant asked for a search warrant, effectively stopping the search of his bedroom. Appellant argues that the testimony "tended to leave the jury with the impression that the Defendant wanted to prevent the police from discovering other evidence against him that could be found in the room." He contends that allowing the jury to draw inferences of guilt from his effort to insist upon his Fourth Amendment right to be free from unreasonable searches and seizures imposes a penalty on the exercise of those rights. He further argues that the admission of this testimony violated his Fifth Amendment right not to be compelled to give evidence against himself. He relies principally on Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965); United States v. Liddy, 509 F.2d 428 (D.C.Cir.1974), cert. denied, 420 U.S. 911, 95 S.Ct. 833, 42 L.Ed.2d 842 (1975); United States v. Yeager, 476 F.2d 613 (3d Cir.), cert. denied, 414 U.S. 855, 94 S.Ct. 154, 38 L.Ed.2d 104 (1973); and Davis v. State, 131 Ala. 10, 31 So. 569 (1901). In Davis v. State, the Alabama Supreme Court reviewed the admission of testimony that the defendant declined to consent to have the shoes he was wearing taken from him for comparison with certain tracks found at the scene of the crime. In holding that this testimony was erroneously admitted, the court relied upon the principles that the accused cannot be compelled to do or say anything that may tend to incriminate him and that his refusal to do so cannot be proved as a circumstance against him. See also Cooper v. State, 86 Ala. 610, 6 So. 110 (1888); Chastang v. State, 83 Ala. 29, 3 So. 304 (1887).
In the instant case, the attorney general attempts to minimize the effect of the testimony by urging that it was not offered for the purpose of raising an inference that appellant had something to hide, but was offered to show the events of the night. The attorney general correctly points out that in Griffin, Liddy, and Yeager, the defendant's assertion of a constitutional right was used against him by the prosecution in closing argument and by the trial court in its charge to the jury, while in the instant case no effort was made to exploit the refusal of appellant to permit a search of his bedroom without a search warrant.
From the record before us, we are persuaded that the objectionable testimony was elicited and allowed for no reason except to show the complete picture of what occurred in appellant's bedroom; nevertheless, the circumstances are such that the admission of the testimony of appellant's request for a search warrant raises the possibility that it was taken as selfincriminating. It could be argued that it was a penalty for exercising a constitutional privilege. It is axiomatic that no person may be penalized for the exercise of a constitutional privilege. Griffin v. California; Grunewald v. United States, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957); United States v. Mumford, 630 F.2d 1023 (4th Cir.1980), cert. denied sub nom. Randell v. United States, 450 U.S. 1041, 101 S.Ct. *773 1759, 68 L.Ed.2d 238 and Mumford v. United States, 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 238 (1981); United States v. Liddy; United States v. Yeager.
However, in the present case, even if it be assumed that there was error in the admission of the testimony, it was error without injury. The evidence against appellant was so overwhelming that, even if there were constitutional error, there is no reasonable possibility that it contributed to the conviction. See, e.g., United States v. Liddy. It is our opinion that there is no probability that the error, if indeed it was error, injuriously affected the substantial rights of appellant. A.R.A.P. 45A.

III
Last, appellant contends that reversible error occurred when the trial court refused to permit him to introduce into evidence letters written to him by his girlfriend, Ms. Stanfield, while he was incarcerated awaiting trial.
During cross-examination of Ms. Stanfield by defense counsel, she identified several letters which she had written appellant while he was in jail awaiting trial. She testified that she signed the letters "Virginia Williams," and defense counsel read a portion of one of the letters that expressed her love for appellant. On objection of the prosecuting attorney, the trial judge examined the letter and stated that it was between two people who had been "cohabitating" and he did not see any relevance in it; however, he did admit the envelopes showing the names and addresses. Subsequently, defense counsel offered several similar letters. The state's objection to their admission on the ground of relevancy was sustained. We have reviewed these letters, as they are a part of the record.
Appellant argues that the letters were relevant for impeachment purposes. He bases this argument solely on the contrast between the letters and Ms. Stanfield's testimony at trial. In other words, he questions how she could have written such letters professing her love and desire for appellant and, then, testify against him at trial. We fail to see anything in the letters that in any way tends to discredit or impeach her testimony. It should not be assumed that, because she loved him, she could not testify truthfully under oath even if her testimony incriminated him. In fact, it is arguable that the letters support her credibility. There was sufficient evidence of the letters and their contents before the jury for it to know that Ms. Stanfield was writing such letters to appellant on a regular basis after he was incarcerated; thus, appellant received the benefit of the evidence for whatever value could be placed upon it.
The scope and extent of cross-examination are matters addressed to the sound discretion of the trial court, whose ruling will not be disturbed absent a showing of gross abuse or substantial injury. Twilley v. State, 472 So.2d 1130 (Ala.Cr.App.), cert. denied, 472 So.2d 1130 (Ala.Cr.App.1985); 81 Am.Jur.2d, Witnesses § 472 (1976). We find no abuse of discretion in the ruling of the trial court here.
We have addressed all issues raised by appellant on appeal and have found no error. This case is due to be, and it is hereby, affirmed.
AFFIRMED.
TYSON, TAYLOR and McMILLAN, JJ., concur.
BOWEN, J., concurs in result only, with opinion.
BOWEN, Presiding Judge, concurring in result.
I concur in the result reached by the majority but write separately to express my disagreement with the majority's conclusion, in Part I, that after the officers told appellant "to wait in his room until they finished talking with his girlfriend and they would then talk with him," "a reasonable person could not have believed that he was not free to leave."
I think that a reasonable person would not have felt free to leave under the circumstances. Nevertheless, I do not believe that a full-scale arrest occurred, but that the officers were fully justified in temporarily *774 detaining the appellant under the principles announced in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); United States v. Hensley, 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985); and United States v. Sharpe, 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985).
"[T]he ability to briefly stop [a person suspected of involvement in a past crime], ask questions, or check identification in the absence of probable cause promotes the strong government interest in solving crimes and bringing offenders to justice. Restraining police action until after probable cause is obtained would not only hinder the investigation, but might also enable the suspect to flee in the interim and to remain at large. Particularly in the context of felonies or crimes involving a threat to public safety, it is in the public interest that the crime be solved and the suspect detained as promptly as possible. The law enforcement interests at stake in these circumstances outweigh the individual's interest to be free of a stop and detention that is no more extensive than permissible in the investigation of imminent or ongoing crimes." United States v. Hensley, 469 U.S. at 229, 105 S.Ct. at 681. (Emphasis added.)
Acting on the reasonable suspicion that appellant had been involved in a homicide next door, the officers in the present case "were authorized to take such steps as were reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." Hensley, 469 U.S. at 235, 105 S.Ct. at 684. Having legally detained appellant, the officers were then, as the Hensley Court observed, "entitled to seize evidence revealed in plain view in the course of the lawful stop...." Id.
"It is clear that there are several investigative techniques which may be utilized effectively in the course of a Terry-type stop. The most common is interrogation, which may include both a request for identification and inquiry concerning the suspicious conduct of the person detained.... Or, the suspect may be detained while it is determined if in fact an offense has occurred in the area, a process which might involve checking certain premises, ... and examining objects... otherwise lawfully discovered, or talking with other people.... There is no reason to conclude that any investigative methods of the type just listed are inherently objectionable; they might cast doubt upon the reasonableness of the detention, however, if their use makes the period of detention unduly long." W. LaFave, Search and Seizure § 9.2(f) at 375-380 (2d ed. 1987).
In the present case, there is no indication that the period of detention was unduly long. Appellant was told to wait in his room until the police finished talking with his girlfriend, after which apparently brief time the appellant cooperated with the authorities. Although the appellant's restriction of movement was complete for a brief period of time, "[t]o conclude that the officers' conduct must be viewed as an arrest from the outset [or here, as the majority does, that there was no restriction at all]... is to create a test which would cast doubt upon most stops. The typical stopping for investigation cannot be viewed as anything but a complete restriction on liberty of movement for a time.... A stopping for investigation is not a lesser intrusion, as compared to arrest, because the restriction on movement is incomplete, but rather because it is brief when compared with arrest...." W. LaFave, Search and Seizure, supra, § 9.2(d) at 363 (emphasis added).
As the Supreme Court noted in United States v. Sharpe, 470 U.S. at 685, 105 S.Ct. at 1575, "[o]bviously, if an investigative stop continues indefinitely, at some point it can no longer be justified as an investigative stop." The Court continued:
"While it is clear that `the brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion,' United States v. Place, [462 U.S. 696] at 709 [103 S.Ct. 2637 at 2645, 77 L.Ed.2d 110] we have emphasized the need to consider *775 the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes.... [I]n evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria." United States v. Sharpe, 470 U.S. at 685, 105 S.Ct. at 1575 (emphasis added and citations omitted).
The appellant's detention here was not too long to be justified as a Terry-type investigative stop because "the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." United States v. Sharpe, 470 U.S. at 686, 105 S.Ct. at 1575.
For these reasons, I concur in the result reached by the majority.