The appellant, Randall Scott, was convicted of robbery in the first degree, a violation of § 13A-8-41, Code of Alabama 1975. He was sentenced to life imprisonment pursuant to the Habitual Felony Offender Act.
The state's evidence tended to show as follows: On August 30, 1988, a robbery occurred at the Citgo Food Mart on the Selma Highway in Montgomery County. The clerk, Sonji Woodard, gave a description of the assailant and identified Randall Scott, the appellant, as the robber after looking at pictures in two different books of photographs of known offenders. She stated that he was wearing a sky blue or light blue tee shirt. The amount of money stolen was estimated by her to be $248.00.
After the appellant was positively identified by Woodard, a warrant for his arrest was issued, and his parole officer, Keith Armagost, was contacted by Corporal Shawn Smith of the Montgomery Police Department. From Armagost, Smith acquired *Page 1224 
the appellant's work address and what, at the time, was thought to be the appellant's home address. Smith and other officers met Armagost at the appellant's place of work. They discovered from the appellant's employer that, in violation of his parole, he was not living at the address he had given Armagost. The employer gave Armagost the appellant's current address. Armagost, upon phone approval from his district supervisor, issued a parole officer's authorization of arrest.
After receiving a description of the appellant's automobile from the employer, Armagost proceeded alone to the appellant's former residence, and then went to his new address. Upon discovering the appellant's car, a red hatchback, he called for backup and was once again joined by Smith and other officers. They conferred with the landlord of the apartments, discovered that the appellant had indeed signed a lease, and then went to the appellant's apartment. They discovered that the appellant was not at home; however, they did encounter the appellant's girlfriend, who had also signed the lease and who gave them consent to enter and search the apartment. Nothing was seized from the appellant's apartment.
After completing their search of the apartment, Armagost and Smith went to the appellant's car. Through the car window, a blue tee shirt that matched the description of the one that had been worn by the robber of the convenience store was visible. Upon searching the car, the officers found a bag of coins taken in the robbery and a pellet gun. At trial, Smith could not recall whether the gun and the bag of coins were visible through the hatchback.
The items were confiscated, shown to the victim, and positively identified. Ultimately, the appellant was taken into custody on the arrest warrant. The appellant presents three issues on appeal.
 I
The appellant first contends that the items seized from the automobile and received into evidence at trial (i.e., the gun, the shirt, and the bag of coins) were acquired through an illegal search and seizure. More specifically, he alleges that the requirements for a warrantless search on plain view grounds were not met. The appellant also alleges that the parole board's guidelines allowing a parole officer to conduct a warrantless search of a parolee's property do not apply here.
However, these issues were not correctly presented to the trial court. Before trial, the appellant moved to suppress the items that were discovered in the car, but his motion was denied after a hearing. The appellant did not make an objection at the time that two of the items were offered and received into evidence at trial and his objection to the third item was insufficient. A timely and sufficient objection is a prerequisite for appellate consideration.
In Phillips v. State, 527 So.2d 154 (Ala. 1988), our Supreme Court stated:
 "It is the law 'that an appellant who suffers an adverse ruling on a motion to exclude evidence (or other matters, e.g., argument of counsel), made in limine, preserves this adverse ruling for post-judgment and appellate review only if he objects to the introduction of the proffered evidence or other matters and assigns specific grounds therefor at the time of trial, unless he has obtained express acquiescence of the trial judge that such subsequent objection to evidence proffered at trial and assignment of grounds therefor are not necessary.' "
527 So.2d at 156 (citations omitted). See also Hagood v. State,588 So.2d 526 (Ala.Cr.App. 1991). There is no evidence in the record that the appellant "obtained express acquiescence" from the trial judge that would allow an untimely objection to be preserved for review. "It is the appellant's duty, not the duty of this court or the trial court, to make a correct and complete record on appeal. See Cardwell v. State, 544 So.2d 987
(Ala.Cr.App. 1989)." Holder v. State, 584 So.2d 872
(Ala.Cr.App. 1991).
When the state moved to have the tee shirt received into evidence, the appellant made no objection. Further, when the bag of coins was offered, the appellant stated, *Page 1225 
"No objection." The appellant's failure to object bars him from questioning the receipt of these items into evidence because "[s]uch an objection is a condition precedent to the party's effectual complaint on appeal." C. Gamble, McElroy's AlabamaEvidence § 426.01(1) (4th ed. 1991).
In contrast, when the pellet gun was offered, the appellant made an objection, but never expressed his grounds, stating only, "Object until I get an opportunity to cross-examine [the victim] about [her identification of the gun]." (R. 38.) This general objection was not followed up on cross-examination of the store clerk. "An objection to the evidence must be made and grounds stated therefor, or the objection and any error are deemed to have been waived." Phillips, 527 So.2d at 156.
After the state had rested its case, the appellant renewed the objections made in the suppression hearing as to the tee shirt, the bag of coins, and the pellet gun. As this court wrote in Snider v. State, 406 So.2d 1008 (Ala.Cr.App.), cert. denied, 406 So.2d 1015 (Ala. 1988), "A motion to exclude [made after the state rested] will not preserve error in the admission of evidence where no timely objection has been made at the time of its admission." 406 So.2d at 1014. See alsoHagood, 588 So.2d at 532.
Even had the appellant's objection been timely and sufficient to preserve the error for appellate review, the appellant's request that those items be suppressed is also due to be denied on the merits. There was probable cause to believe that the appellant had committed the robbery. At the time of the search, a valid arrest warrant had already been issued for the appellant's arrest.
The warrantless search was justified on "plain view" grounds. A warrantless search based on plain view grounds is lawful if (1) the officer who conducts the search is legitimately on the premises where he is afforded a plain view, (2) the officer comes upon the evidence inadvertently,[1] and (3) it is "immediately apparent" that the object viewed is evidence of some criminal wrongdoing. Coolidge v. New Hampshire,403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). See also Williams v.State, 527 So.2d 764 (Ala.Cr.App. 1987). See 3 W. LaFave,Search Seizure: A Treatise on the Fourth Amendment § 7.5(d) (2d ed. Supp. 1991) (discussing the potential inapplicability of Horton to the different states as urged by the dissent).
First, "the police officer's initial intrusion must be lawful or he must properly be in a position from which he can view a particular area." McCammon v. State, 499 So.2d 811, 813
(Ala.Cr.App. 1986). Here, the parole officer and the Montgomery police officers were legitimately on the premises of the apartment complex in which the appellant resided because they were attempting to execute two warrants to arrest the appellant (that of the parole officer and that of the police).
Further, to justify a seizure upon grounds of "plain view," "it must be immediately apparent to the police that the items observed may be evidence of a crime, or otherwise subject to seizure." McCammon, 499 So.2d at 814. The term " 'immediately apparent' does not 'imply that an unduly high degree of certainty as to the incriminatory character of evidence is necessary . . .' [nor does it] mean that an officer must 'be possessed of near certainty as to the seizable nature of the items.' " Williams, 527 So.2d at 770 (quoting Texas v. Brown,460 U.S. 730, 741, 103 S.Ct. 1535, 1543, 75 L.Ed.2d 502
(1983)). In deciding whether an object in plain view could be evidence of a crime, the officer's "judgment must be grounded on probable cause; however, the officer need not be convinced beyond a reasonable doubt as to the incriminating nature of the evidence discovered. It is sufficient if the evidence raises the probability that criminal activity is afoot." McCammon,499 So.2d at 814. *Page 1226 
In Brown, the United States Supreme Court stated that great weight should be placed on the common sense observance of the officer on the scene, noting that a " 'practical, nontechnical' probability that incriminating evidence is involved is all that is required." 460 U.S. at 742, 103 S.Ct. at 1543. "[T]he plain view exception would be worthless if officers had to be 'absolutely certain' that what they saw was seizable." 2 W. LaFave, Search Seizure, supra, § 6.7(a). See also Williams,527 So.2d at 770. "[T]he reasonableness of the officer's act must be gauged at the time when he first viewed the items."Williams, 527 So.2d at 771.
We have considered the remaining contentions of the appellant concerning the admission of the items seized from the appellant's automobile, but decide them against him without discussion.
 II
The appellant next argues that the trial court erred in denying his motion made pursuant to Batson v. Kentucky,476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), alleging that the state used its peremptory strikes in a racially discriminatory fashion.
In Batson, the Supreme Court held that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." 476 U.S. at 89,106 S.Ct. at 1719. The principles of Batson were initially interpreted and applied by the Alabama Supreme Court in Exparte Jackson, 516 So.2d 768 (Ala. 1986), and in Ex parteBranch, 526 So.2d 609 (Ala. 1989).
Usually, once a defendant makes a timely Batson motion, he must then establish a prima facie case, and, once he has done so, the prosecution must produce "a race-neutral explanation as to why peremptory challenges were used to exclude members of a minority." Harrell v. State, 555 So.2d 263, 268 (Ala. 1989), reversed on return to remand, 571 So.2d 1269 (Ala.Cr.App.), writ quashed, 571 So.2d 1270 (1990), cert. denied, ___ U.S. ___, 111 S.Ct. 1641, 113 L.Ed.2d 736 (1991) (footnote omitted). However, in cases such as the one before us, where the trial court requires or allows the prosecution to recite its explanations for its strikes without first ruling on whether the defense has made a prima facie case, we will still review the reasons given by the prosecution and the trial court's findings. Hernandez v. New York, ___ U.S. ___, 111 S.Ct. 1859,114 L.Ed.2d 395 (1991); McLeod v. State, 581 So.2d 1144
(Ala.Cr.App. 1990); Avery v. State, 545 So.2d 123 (Ala.Cr.App. 1988); Currin v. State, 535 So.2d 221 (Ala.Cr.App.), cert. denied, 535 So.2d 225 (Ala. 1988). The trial court's ruling on the Batson motion will be reversed only if it is clearly erroneous. Yelder v. State, [Ms. 3 Div. 212, Oct. 11, 1991], 1991 WL 238088 (Ala.Cr.App. 1991); Sims v. State,587 So.2d 1271 (Ala.Cr.App. 1991); Jackson v. State, 549 So.2d 616
(Ala.Cr.App. 1989).
The appellant in this case is black. The record reveals that the original venire was composed of 13 blacks and 15 whites. The state used seven of its eight peremptory strikes to remove blacks from the venire, leaving six blacks and six whites to serve on the jury. After the jury was struck, the appellant made a timely Batson motion. After the appellant stated the reasons for his motion, the prosecution stated that it had good reasons for its strikes, and the trial court allowed the state to relate those reasons without ruling directly on whether the appellant had met his burden. The appellant in this case failed to prove a prima facie case of discrimination. "In determining whether there is a prima facie case, the court is to consider 'all relevant circumstances' which could lead to an inference of discrimination." Ex parte Bird, 594 So.2d 676 (Ala. 1991) (quoting Branch, 526 So.2d at 622) (lists some of the "relevant circumstances" to be examined in deciding whether the defendant has shown a prima facie case) (footnote and citations omitted). A highly relevant circumstance, and one that we feel completely rebuts any inference of discrimination raised, is that the jury had a 50% black composition while *Page 1227 
the venire was composed of 13 blacks and 15 whites. As our Supreme Court wrote in Harrell:
 "A defendant must offer some evidence in addition to the striking of blacks that would raise an inference of discrimination. When the evidence shows only that blacks were struck and that a greater percentage of blacks sat on the jury than sat on the lawfully established venire, an inference of discrimination has not been created. Logically, if statistical evidence may be used to establish a prima facie case of discrimination, by showing a discriminatory impact, Harrell, 555 So.2d at 267, citing United States v. David, 803 F.2d 1567, 1571 (11th Cir. 1986), then it should be available to show the absence of a discriminatory purpose."
571 So.2d at 1271-72. See also Demunn v. State, [Ms. 90-940, Oct. 11, 1991], 1991 WL 238130 (Ala.Cr.App. 1991) (Bowen, J., concurring in result only) (no prima facie case because five blacks served on the jury); Bird, 594 So.2d at 680 ("a larger percentage of black veniremembers eventually . . . seated on [the jury than was on the original venire] raises less suspicion than if a small representation is seated and affords less support for a prima facie case of discrimination"); UnitedStates v. Forbes, 816 F.2d 1006 (5th Cir. 1987) (no prima facie showing of discrimination where black/white ratio on jury same as black/white ratio on venire).
After taking all of the "relevant circumstances" into consideration, we conclude that in this case, the jury had a 50% black representation. This percentage is greater than that of the black composition of the venire. Therefore, we find that a prima facie case of discrimination has not been established in this case.
Even though we generally try to avoid getting "bogged down on the question of whether the defendant made a prima facie
showing in cases where the [trial] court has required an explanation," Currin, 535 So.2d at 223, quoting United Statesv. Forbes, 816 F.2d 1006, 1010 (5th Cir. 1987), the trial judge here did not "require" the prosecution to state its reasons; the prosecution volunteered to do so after the judge expressed his doubts as to whether a prima facie showing had been made. Because we have concluded that the appellant did not establish a prima facie case, we will "examine the state's explanations for its strikes in light of our rule regarding the defendant's burden of production in presenting a prima facie case." Bird,594 So.2d at 683-84.
The prosecution stated the following reasons for striking seven black veniremembers:
 "My first strike was [Number 177]. She's a retired teacher. She also is associated with [Alabama State University]. She was wearing a fraternal emblem around her neck, which is a teachers' fraternal organization, also associated [with] and has a main — their main headquarters is at Alabama State University. [Number 167] . . . is a student at [Alabama State University]. Your Honor, the State of Alabama struck those two jurors — potential jurors because of all the publicity that has been in the paper concerning a potential investigation [by the Montgomery County District Attorney] with one of . . . — the head man at [Alabama State].
". . . .
 "In addition to that, there have been many fliers, many pamphlets that have been submitted and circulated around and on the campus of [Alabama State] concerning the D.A.'s office. We did not — we feel that someone associated with [Alabama State] might consider the district attorney's office in a bad light at this time because of all that publicity.
 "My third strike was [Number 184]. Your Honor, in 1984 he was convicted by our office in a theft of property in the third degree. In '87 he was convicted of two counts of theft of property in the third degree. In 1960 in our office he was convicted of petty larceny. And that was the reason that I struck [Number 184].
 "[Number 193] was the State's fourth strike. . . . Our office prosecuted in 1974 a receiving stolen property case against [him]. *Page 1228 
". . . .
 "That was not a conviction. It was a district court preliminary hearing and was bound over to the grand jury.
". . . .
 "[Number 150], my sixth strike. There were — and the seventh strike, [Number 157]. There were two jurors, Your Honor, who responded to a question of had any of their family — had they or any of their relatives been convicted of a crime. And we struck both of those individuals, everyone who had said that a member of their family had been convicted of a crime.
 "The eighth strike was [Number 185], Your Honor. When the court asked the clerk to read the names of the venire and this individual was asked to stand up and state whether he was married, what his occupation was, this juror laughed, giggled, showing a demeanor that the State of Alabama considered not a serious demeanor for these proceedings, being a robbery in the first degree trial. His basic appearance that I observed and that Mrs. Frith observed exhibited that he was not in a serious demeanor to participate and listen to the facts of this case. And that's the reason that I struck [Number 185]. He was the only juror who did exhibit that type of demeanor in the entire venire."
(R. 8-12).
The trial court then denied the appellant's Batson motion on the grounds that the strikes were "not done based on a racially motivated plan" and, further, that "at least six blacks [would] sit on the jury panel." (R. 14)
We find that the prosecutor's reason for striking veniremembers number 167 and 177 — possible hostility towards or prejudice against the district attorney's office — was race-neutral. See Yelder v. State, 596 So.2d 596 (Ala.Cr.App. 1991) (Some veniremembers signed an anti-police petition concerning a dispute between the Montgomery Police Department and a group of black citizens; one veniremember stated that she knew nothing about the case, then stated that "people in East Montgomery were upset about it"); Wagner v. State,555 So.2d 1141 (Ala.Cr.App. 1989) (veniremember looked and acted hostile towards the state); Williams v. State, 548 So.2d 501
(Ala.Cr.App. 1988), cert. denied, 489 U.S. 1028,109 S.Ct. 1159, 103 L.Ed.2d 218 (1989) (veniremember married to defense attorney who had recently appeared as defendant's attorney of record against the prosecutor). Here, both veniremembers, at the time of trial, had strong ties with Alabama State University, against which the Montgomery County District Attorney was conducting an investigation concerning that institution's president. At trial, the court stated:
 "For the past several weeks we have been reading articles of the district attorney's office conducting investigations in the university, and . . . I can certainly understand the concern that [the prosecution] has, because there have been and I'm aware of a great many petitions that have been circulated to contest the district attorney's investigation, so I'm satisfied that that certainly could create the inference that those individuals could not sit in fair judgment in a case that the district attorney's office is associated in."
(R. 18-19.)
The prosecutor's reasons for striking veniremembers number 184, 193, 150, and 157 — that they or a relative of theirs had been either charged with, prosecuted for, or convicted of a crime — were also race-neutral. See Yelder, 596 So.2d at 598
(one veniremember's brother had been charged with burglary; another veniremember had been prosecuted on a worthless check charge); Wagner, 555 So.2d 1141 (one veniremember had been prosecuted by district attorney's office; another veniremember had theft and petty larceny charges pending against him);Jackson, 549 So.2d 616 (veniremember had prior conviction for second degree murder); Powell v. State, 548 So.2d 590
(Ala.Cr.App. 1988), aff'd, 548 So.2d 605 (Ala. 1989) (one veniremember's uncle had been falsely prosecuted; another veniremember's nephew was a defendant in burglary case; another veniremember had a family member who *Page 1229 
had been charged with a crime; a veniremember had been charged with DUI; a veniremember had been prosecuted for various offenses); Avery, supra, (veniremember was a defendant in pending criminal case); Currin, 535 So.2d 221 (veniremember connected with recently charged individuals).
Finally, the prosecutor's reason for striking veniremember number 185 — that he giggled and lacked a serious demeanor — was not racially discriminatory. This court has expressed some dismay at the use of a juror's demeanor as grounds for striking that juror in that "it presents considerable difficulty to the trial court as well as to the reviewing authorities in determining its truthfulness." Avery, 545 So.2d at 127. However, on several occasions striking a juror because of his or her demeanor or attitude has been held to be race-neutral. E.g., Mitchell v. State, 579 So.2d 45 (Ala.Cr.App. 1991) (the fact that veniremember appears hostile or impatient is a valid reason for striking that juror); Wagner, 555 So.2d 1141
(veniremember looked and acted hostile to the prosecutor);Currin, 535 So.2d 221 (veniremember wore sunglasses in courtroom and was hostile in answering questions; veniremember was "laughing" and was "amused" with state's questions; veniremember was chewing gum and talking). See also UnitedStates v. Mathews, 803 F.2d 325, 331 (7th Cir. 1986), reversed on another ground, 485 U.S. 58, 108 S.Ct. 883, 99 L.Ed.2d 54
(1988) (veniremember "had demonstrated a pointed disinterest in the proceedings evidenced not only by her tardiness but also by her posture and demeanor"); Lockett v. State, 517 So.2d 1346,1350 (Miss. 1987), cert. denied, 487 U.S. 1210, 108 S.Ct. 2858,101 L.Ed.2d 895 (1988) (veniremember "wore a hat in the courtroom . . . and his general demeanor suggested to the prosecutor that he was unstable, unconcerned, and had no respect for the proceedings").
At trial, the court approved the prosecution's strikes based on the veniremember's demeanor by stating the following:
 "[Number 185], I also noted his demeanor when he stood up, and for all practical purposes, he laughed when his name was called. I was rather surprised that he didn't think that this was a more serious nature than apparently he considered and apparently every other juror considered it to be. His was the only demeanor that I thought struck me as very unusual in light of the circumstances and the place we're located."
(R. 19.)
The trial court's denial of the appellant's Batson motion was not "clearly erroneous."
 III
Last, the appellant contends that the trial court erred in denying his motion for a new trial without a hearing.
Neither the rules in effect at the time (Alabama Rules of Criminal Procedure, Temporary) nor the present rules (Alabama Rules of Criminal Procedure) require a hearing when a motion for new trial has been made. It would be unreasonable to request a hearing on every new trial motion.
For the foregoing reasons, the appellant's conviction is due to be, and it is hereby, affirmed.
AFFIRMED.
All the Judges concur, except MONTIEL, J., recuses.
[1] The United States Supreme Court no longer requires a showing of inadvertency to justify a warrantless search based on plain view grounds. Horton v. California, 496 U.S. 128,110 S.Ct. 2301, 110 L.Ed.2d 112 (1990).